Rule 23 order filed
June 10, 2020.
Motion to publish granted
July 2, 2020.

2020 IL App (5th) 170462

NO. 5-17-0462

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Madison County. |
| v. | ) ) | No. 04-CF-639 |
| MICHAEL GREEN, | ) ) | Honorable Jennifer L. Hightower, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE WELCH delivered the judgment of the court, with opinion. Justices Cates and Moore concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, Michael Green, appeals from the Madison County circuit court's denial of his motion for leave to file a successive postconviction petition. For the following reasons, we affirm.

¶ 2                    I. BACKGROUND

¶ 3               A. Conviction and Direct Appeal

¶ 4    Following a jury trial, the defendant was convicted of the first degree murder of two-year-old Z.H. and sentenced to 60 years' imprisonment. The defendant appealed, arguing that his videotaped statement should have been suppressed and that the trial court erred in refusing to instruct the jury on involuntary manslaughter. This court rejected the defendant's arguments and affirmed his conviction in *People v. Green*, No. 5-05-0582 (Mar. 16, 2007) (unpublished order

1

under Illinois Supreme Court Rule 23). The order issued in that appeal included the following summary of the evidence adduced at the defendant's trial, in relevant part.

¶ 5    In February 2004, Z.H. was living with her paternal grandparents, JoAnne and Stephen Harrison, in Alton, Illinois. Z.H. had been in their care since March 2003. Z.H. occasionally stayed with her biological mother, Sharina Smallwood. In February 2004, the Harrisons made arrangements to have Z.H. stay with Smallwood for a few days because Mrs. Harrison was scheduled to have foot surgery and Mr. Harrison was concerned that he could not adequately care for Z.H. and his wife. At the time, the Harrisons were unaware that Smallwood was involved in a relationship with the defendant and that the defendant was staying at Smallwood's apartment. The Harrisons left Z.H. with Smallwood on February 29, 2004, and they intended to take her home on March 6, 2004. Z.H. was in good health and had no bruises on her face, head, or torso.

¶ 6    A tragic event occurred during the early morning hours of March 6, 2004, just hours before Z.H. was to go back to her grandparents' home. At about 2 a.m., Z.H. woke up crying. The defendant was awakened by her crying and went into her room. Z.H., still crying, asked for a drink of water. The defendant took Z.H. downstairs, passing his cousin, Jason Green, and his cousin's girlfriend in the stairwell. The defendant took Z.H. into the kitchen. He picked her up and set her on the kitchen counter. The defendant told Z.H. to stop crying. He said he was going to get her a drink. When Z.H. did not stop crying, the defendant punched her two or three times in the stomach. Z.H. continued to cry. The defendant then hit Z.H. in the face, knocking her off the counter and onto the concrete floor. When the defendant picked Z.H. up, she was limp. Her head rolled to the side, and she was making snoring sounds. The defendant took Z.H. outside to give her some air. He then carried her back upstairs, again passing Jason and Jason's girlfriend. Jason noted how quickly the child had fallen asleep. The defendant put Z.H. back in her bed. He then went back to

2

sleep. When the defendant awoke the next afternoon, Z.H. was still in her bed. She did not wake up. She was still snoring. Around 5 p.m. that afternoon, Smallwood attempted to wake Z.H., but the child did not respond to her mother. She was limp, and she continued to snore. At that point, Smallwood decided to take Z.H. to Alton Memorial Hospital.

¶ 7 Dr. Alan Johnson, an emergency room physician, saw Z.H. when she arrived at the hospital. When he examined Z.H., he noted that she was limp and that she did not respond to stimuli. She was breathing on her own. Dr. Johnson testified that he found bruising on the child's forehead, back, and abdomen and swelling in the lip area. He stated that the injuries appeared fresh and recently inflicted. Dr. Johnson found that Z.H. was posturing and that there was retinal hemorrhaging in her right eye. He testified that posturing is an abnormal flexing of the extremities that indicates bruising or swelling of the brain. He stated that retinal hemorrhaging is indicative of severe trauma, commonly seen in infants with shaken baby syndrome. Dr. Johnson ordered an immediate transfer to a trauma center.

¶ 8 Z.H. was airlifted to St. Louis Children's Hospital. She was initially evaluated by Dr. Jeffrey Leonard, a pediatric neurosurgeon. Dr. Leonard found bruising to the child's face, scalp, abdomen, and back and retinal hemorrhages. Dr. Leonard noted that Z.H. had a cough-and-gag reflex, which indicated that she still had some brain function. Dr. Leonard ordered computerized tomography (CT) scans of Z.H.'s head and abdomen. The CT scan of the head revealed swelling in both hemispheres of the brain and subdural hemorrhaging. It also showed a nondisplaced fracture of the parietal bone, which is located in the back of the skull. The CT scan of the abdomen revealed a large laceration of the child's liver. A plain X-ray showed an acute rib fracture. Dr. Leonard stated that the child's sleepiness and snoring were signs that she had elevated cranial pressure, which affects the respiratory centers.

3

¶ 9    Dr. Leonard testified that he placed a small drain into the right ventricle of the brain to drain spinal fluid and reduce the cranial pressure. He also prescribed medications to control the pressure. The treatment was not successful. Z.H. progressively lost brain function over a very short period of time. She was pronounced dead on March 8, 2004. Dr. Leonard testified that the brain injuries that Z.H. sustained were not consistent with a fall from the kitchen counter as described by the defendant. He stated that the brain injuries and retinal hemorrhaging are indications of a violent shaking event and consistent with shaken baby syndrome. He stated that other injuries, such as the liver laceration and the broken rib, were indicators of an acute trauma.

¶ 10    Dr. Raj Nanduri, an assistant medical examiner, conducted the postmortem examination on Z.H.'s body and testified about her findings. Dr. Nanduri testified that she noted a large area of bruising and marked swelling of the child's right forehead and the frontal area of the scalp. There was a larger area of bleeding noted beneath the right frontal area of the scalp. Another large area of bleeding was observed at the back of the head. Dr. Nanduri found subdural hemorrhages on both sides of the brain. She noted bruising and swelling around the eyes and the lips. She found bleeding around the optic nerves and retinal hemorrhages in both eyes. Dr. Nanduri testified that the injuries to the brain and the bilateral retinal hemorrhages were indicative of violent shaking and that the extensive bruising and swelling around the scalp and face were indicative of a blunt-force trauma.

¶ 11    Dr. Nanduri's examination also revealed subcutaneous hemorrhages at the lower back and ribs on the right side of the child's body. Dr. Nanduri testified that the margins of those wounds were not clearly defined, indicating that the area had been impacted by a flat object or a fist. There were fractures to the sixth and seventh ribs on the right side of the body. There was bleeding near the fractures and bruising to the lower lobe of the right lung. Dr. Nanduri testified that the

4

abdominal injuries appeared to be of very recent origin and that they were indicative of blows to that area. Dr. Nanduri found a laceration of the liver with acute hemorrhaging and inflammation at the site of the laceration. Additional abdominal bleeding was noted. Dr. Nanduri testified that a blow or a kick to the abdomen would cause the injuries that she had observed. Dr. Nanduri opined that Z.H. died from a closed head injury and blunt trauma to the abdomen. She testified that Z.H. would be classified as a battered child and that the death was a homicide and not an accident.

¶ 12    At the time of her death, Z.H. was 34 inches tall and weighed 41 pounds. The defendant's identification card indicated that he was 23 years old, that he was 69 inches tall, and that he weighed 167 pounds.

¶ 13    On March 7, 2004, the Alton police arrested the defendant on outstanding warrants that were unrelated to Z.H.'s death. Sometime later that day, Detective Brantley learned about the defendant's arrest, so he went to the Alton jail to interview the defendant about Z.H.'s injuries. The defendant was advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966); prior to the interview, he indicated that he understood his rights, and he executed a signed waiver of his rights. During the interview, the defendant stated that he did not know how Z.H. was injured.

¶ 14    Z.H. succumbed to her injuries on March 8, 2004. After learning of her death, Detective Simmons returned to the jail to interview the defendant. The defendant was again advised of his *Miranda* rights and executed a written waiver. During the interview, the defendant stated that Z.H. was crying in the middle of the night, that he took her downstairs to get her a drink, that he set her on the counter next to the refrigerator, and that he "spanked" her in the face when she would not stop crying. The defendant stated that Z.H. fell off the counter and onto the floor. The defendant said that Z.H. was unconscious and that she was snoring. He took her outside to get some air, but

5

she did not wake up. The defendant said that he then carried her upstairs and laid her back in her bed.

¶ 15    On March 29, 2004, Detective Brantley and Detective Simmons made arrangements to interview the defendant, who had been transferred to the Madison County jail. The detectives wanted to interview the defendant again because the defendant's description of the events leading to Z.H.'s injuries did not correspond with the autopsy findings. The detectives advised the defendant of his *Miranda* rights, and he again signed a written waiver. The defendant agreed to a videotaped interview. During the course of the interview, the defendant acknowledged that he had punched Z.H. in the stomach several times, to get her to stop crying, before he hit her in the face.

¶ 16         B. The Defendant's First Collateral Attack on the Judgment of Conviction

¶ 17    In May 2008, the defendant filed with the circuit clerk a *pro se* postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2008)). In his first postconviction petition, the defendant argued that he was denied his constitutional right to the effective assistance of counsel because counsel allowed a biased juror to serve on his jury. The defendant also alleged that his trial counsel was ineffective for failing to object to the State's introduction of photographs from Z.H.'s autopsy. In June 2008, the circuit court summarily dismissed the petition as frivolous and patently without merit. The court further found that the defendant's claims were procedurally forfeited because he failed to raise them on direct appeal and that they were rebutted by the record. This court affirmed the judgment in *People v. Green*, No. 5-08-0374 (Sept. 29, 2009) (unpublished order under Illinois Supreme Court Rule 23).

¶ 18    C. The Defendant's Second Collateral Attack on the Judgment of Conviction

¶ 19    In May 2017, the defendant filed a *pro se* motion for leave to file a successive postconviction petition. He asserted that his sentence of 60 years' imprisonment constituted a

6

*de facto* life sentence that violated the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) as applied to him because he was a young adult when the murder occurred, and the trial court should have considered his youth in rendering his sentence. In alleging that he had cause for failing to bring the successive petition's claims in the previous petition, the defendant relied on two cases, *People v. Harris*, 2016 IL App (1st) 141744 (*Harris I*), and *People v. House*, 2015 IL App (1st) 110580, which he asserted had only recently extended scientific evidence on the adolescent brain development to young adults. He also alleged that prejudice resulted from failing to bring these claims earlier in that he had rehabilitative potential and had held jobs, taken various courses, and donated his time in prison.

¶ 20    In September 2017, the defendant filed a *pro se* "motion to supplement pending 'successive' post-conviction petition instanter," asserting a claim of actual innocence based on newly discovered evidence. Specifically, the defendant relied on "advances in medical science regarding 'shaken baby syndrome/abusive head trauma' " since his trial. The defendant also alleged a claim of ineffective assistance of counsel relating to such evidence.

¶ 21    On November 2, 2017, the circuit court denied the defendant leave to file a successive postconviction petition, finding that he failed to satisfy the prejudice element of the cause-and-prejudice test and that he failed to present a cognizable claim of actual innocence. The defendant appeals.

¶ 22                                    II. ANALYSIS

¶ 23    The Act provides a method for criminal defendants to assert that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1(a)(1) (West

7

2016). "A proceeding under the Act is a collateral attack on the judgment of conviction." *People v. Wrice*, 2012 IL 111860, ¶ 47. Although our supreme court has made clear that the Act contemplates only one postconviction proceeding, the court has provided in its case law two bases upon which the bar against successive proceedings will be relaxed: (1) a showing of cause and prejudice or (2) a claim of actual innocence. *People v. Edwards*, 2012 IL 111711, ¶¶ 22-23.

¶ 24 Here, the defendant's first claim alleges cause and prejudice, and his second claim alleges actual innocence. We will discuss each of the defendant's claims below.

¶ 25                                          A. Cause and Prejudice

¶ 26 The defendant initially asserts that the circuit court erred in denying him leave to file a successive postconviction petition, where he was 22 years old at the time of his offense, and the trial court failed to consider his youth when imposing his 60-year sentence. Thus, the defendant claims his sentence violated the eighth amendment to the United States Constitution. The State responds that the defendant's sentence was constitutional.

¶ 27 When a defendant seeks to file a successive postconviction petition, he must first obtain leave of court. 725 ILCS 5/122-1(f) (West 2016). Leave of court may be granted only if defendant demonstrates "cause" for his failure to bring the claim in his initial postconviction proceeding and "prejudice" resulting therefrom. See *id*. (codifying the cause-and-prejudice test articulated in *People v. Pitsonbarger*, 205 Ill. 2d 444, 458-60 (2002)); *Wrice*, 2012 IL 111860, ¶ 48. A defendant shows cause by identifying an objective factor that impeded his ability to raise a specific claim in his initial postconviction petition. 725 ILCS 5/122-1(f) (West 2016); *Wrice*, 2012 IL 111860, ¶ 48. A defendant shows prejudice by demonstrating that the claim not raised in his initial postconviction petition so infected his trial that the resulting conviction or sentence violated due process. *Wrice*, 2012 IL 111860, ¶ 48. It is defendant's burden to establish a *prima facie* showing

of cause and prejudice in order to be granted leave before further proceedings on his claims can follow (*People v. Bailey*, 2017 IL 121450, ¶ 24; *People v. Smith*, 2014 IL 115946, ¶ 30), and both elements must be satisfied for defendant to prevail (*People v. Guerrero*, 2012 IL 112020, ¶ 15). For the reasons that follow, the defendant cannot establish prejudice since his claims are not legally cognizable.

¶ 28    In *Miller v. Alabama*, 567 U.S. 460, 479 (2012), the United States Supreme Court held that the eighth amendment to the United States Constitution "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." In reaching this conclusion, the Court found that a mandatory sentence of "life without parole for a juvenile precludes consideration" of the juvenile's age and its "hallmark features," including the juvenile's family and surrounding home environment, the extent of the juvenile's participation in the offense, the effects of familial or peer pressure, the "inability to deal with police officers or prosecutors," the incapacity to assist the juvenile's own attorneys, and the possibility of rehabilitation. *Id*. at 477-78. The *Miller* Court announced that "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id*. at 489.

¶ 29    More recently, the Illinois Supreme Court has held that *Miller* applies to discretionary life sentences without parole for juvenile defendants. *People v. Holman*, 2017 IL 120655, ¶ 40. However, our supreme court has declined to extend *Miller* to offenders who are 18 years of age or older, finding that the *Miller* Court "confirmed that the age of 18 is the legal line separating adults from juveniles" and that the protections of *Miller* only apply to juvenile offenders. *People v. Harris* (*Harris II*), 2018 IL 121932, ¶¶ 58-61. Whether a sentence is constitutional is a question of law, which we review *de novo*. *People v. Taylor*, 2015 IL 117267, ¶ 11.

¶ 30   The defendant in this case received a 60-year sentence for first degree murder, which was within the applicable discretionary sentencing range. The parties do not dispute that the defendant was 22 years old at the time of the offense and was therefore an adult. Accordingly, *Miller* does not apply to the defendant's sentence, and his sentence does not violate the eighth amendment to the United States Constitution. See *Harris II*, 2018 IL 121932, ¶¶ 58-61.

¶ 31   The defendant additionally argues that his sentence violated the proportionate penalties clause of the Illinois Constitution. The States responds that this clause is also inapplicable to the defendant's sentence because he was an adult offender, and his life sentence was discretionary and not mandatory.

¶ 32   The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11.

¶ 33   In asserting that his natural life sentence violated the proportionate penalties clause, the defendant primarily relies on *People v. House*, 2019 IL App (1st) 110580-B (in which a 19-year-old defendant received a mandatory life sentence). However, we find that *House* does not apply. In the original opinion in *House*, and on remand from the supreme court, the First District's ruling was largely premised on the fact that defendant was sentenced on a conviction that was based on a theory of accountability. *House*, 2015 IL App (1st) 110580; *House*, 2019 IL App (1st) 110580-B, ¶ 32 ("As discussed throughout our previous analysis, defendant's conviction under the theory of accountability weighed heavily in our conclusion that his mandatory natural life sentence shocked the moral conscience of the community."). The court emphasized the fact that the young defendant was not present at the scene of the murder but received "the same mandatory sentence of natural life as *** [the] codefendant who participated in the shooting of the victims," while

another codefendant was released from the penitentiary during resentencing because he was 17 years old when the offense occurred. *House*, 2019 IL App (1st) 110580-B, ¶ 46.

¶ 34 The *House* court also noted that a mandatory sentence does not afford a trial court "any discretion if an offender is found guilty of triggering offenses," and the "lack of discretion afforded the trial court for the imposition of a mandatory life sentence is especially relevant when the defendant is a young adult, over 18, but still not considered a fully mature adult." *Id*. ¶ 60. The court therefore found that as applied to defendant, the mandatory natural life sentencing statute at issue violated the proportionate penalties clause. *Id*. ¶¶ 65-66. The matter was remanded for a new sentencing hearing so that the trial court could have "the ability to consider the relevant mitigating factors prior to imposing a sentence of such magnitude." *Id*. ¶ 65.

¶ 35 Here, unlike in *House*, the defendant was not convicted on a theory of accountability, and his sentence was not mandatory. Rather, the defendant was convicted for directly participating in the murder of Z.H., and he received a discretionary 60-year sentence. Therefore, the reasoning of *House* does not apply here.

¶ 36 In his reply brief, the defendant asserts that the distinction between a mandatory and discretionary sentence is not relevant to our analysis. However, the defendant supports this assertion with a case that involved a juvenile offender bringing an eighth amendment *Miller* challenge, not a proportionate penalties claim. See *Holman*, 2017 IL 120655 (in which defendant was 17 years old at the time of the offense and brought an eighth amendment claim pursuant to *Miller* on appeal). This case did not address whether an adult offender could challenge a discretionary life sentence under the proportionate penalties clause. See *id*.

¶ 37 The defendant sets forth no legal authority supporting the assertion that a discretionary 60-year sentence violates the proportionate penalties clause, when imposed on an adult who was

11

convicted for directly participating in a murder. To the contrary of this assertion, Illinois appellate courts have recently found that even a mandatory life sentence imposed on a young adult offender did not violate the proportionate penalties clause, where defendant directly participated in the murders for which he was convicted. See *People v. White*, 2020 IL App (5th) 170345, ¶¶ 27-28 (distinguishing itself from *House* on the grounds that the 20-year-old defendant was not convicted on a theory of accountability); *People v. Pittman*, 2018 IL App (1st) 152030, ¶¶ 37-40 (distinguishing itself from *House* on the grounds that the 18-year-old defendant was not convicted on a theory of accountability). Here, the 22-year-old defendant was convicted of directly participating in the murder for which he was convicted, as the evidence at trial showed that the defendant violently punched a 2-year-old child in the stomach multiple times, hit her in the face, and shook her causing her death.

¶ 38 Moreover, we note parenthetically that the record reveals the trial court considered multiple circumstances regarding the defendant's youth. Specifically, the court was presented with evidence regarding the defendant's family history, including his mother's drug abuse and incarceration, his own history with drugs, and his criminal record as a juvenile and as an adult. Further, defense counsel argued that the defendant's age and rehabilitative potential were reasons for the court to sentence the defendant to the minimum sentence of 20 years' imprisonment.

¶ 39 The defendant further asserts that *Harris II*, 2018 IL 121932, supports a finding that a young adult may challenge a discretionary life sentence based on the proportionate penalties clause. However, the Illinois Supreme Court in *Harris II* never reached the merits of this issue. In *Harris II*, defendant filed a direct appeal challenging his sentence based on the proportionate penalties clause and eighth amendment. *Id*. ¶ 17. The appellate court found that defendant's mandatory *de facto* life sentence violated the proportionate penalties clause. *Id*. ¶ 18. The State

12

appealed to the supreme court, and defendant asserted that his mandatory *de facto* life sentence violated the proportionate penalties clause of the Illinois Constitution. *Id.* ¶¶ 20, 36.

¶ 40    The supreme court in *Harris II* observed that defendant's proportionate penalties claim was an "as-applied challenge," which required "a showing that the statute is unconstitutional as it applies to the specific facts and circumstances of the challenging party." *Id.* ¶¶ 37-38. However, defendant failed to raise his as-applied constitutional challenge in the trial court, "an evidentiary hearing was not held on his constitutional claim, and the trial court did not make any findings of fact on defendant's specific circumstances." *Id.* ¶ 40. The court stated that "a reviewing court is not capable of making an as-applied finding of unconstitutionality in the factual vacuum created by the absence of an evidentiary hearing and findings of fact by the trial court." (Internal quotation marks omitted.) *Id.* ¶ 41. The court therefore concluded that defendant's claim on direct appeal was premature and "more appropriately raised in another proceeding" that allows presentation of evidence not contained in the record, such as a postconviction proceeding. *Id.* ¶¶ 46, 48.

¶ 41    We find *Harris II* does not support the defendant's position on collateral appeal—while the supreme court may have held that Harris's as-applied proportionate penalties claim was more appropriate for a proceeding other than a direct appeal, the court made no finding as to how successful the claim would be in postconviction proceedings. *Id.* ¶ 48. The court only held that where a defendant did not raise before the trial court an as-applied challenge to his sentence based on the proportionate penalties clause, a reviewing court could not have made a finding on the merits of the claim, since the record lacked any information regarding defendant's youth and the challenge was therefore premature for a direct appeal. *Id.* ¶¶ 46, 48.

¶ 42    "[L]eave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted by the petitioner,

that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *Smith*, 2014 IL 115946, ¶ 35. In his motion to file a successive postconviction petition, the defendant raised no facts or circumstances regarding his youth that were not already included in the record, presented at his sentencing hearing, and considered by the trial court. Further, we find that the legal authority cited by the defendant simply does not support his conclusion that a discretionary 60-year sentence imposed on a 22-year-old defendant, based on direct participation in the crime of first degree murder and imposed after the presentation of a presentence investigation report (PSI) and argument regarding his youth and rehabilitative potential, could be found to violate the proportionate penalties clause. The defendant's claim fails as a matter of law. See *People v. Handy*, 2019 IL App (1st) 170213, ¶¶ 41-42 (finding that the circuit court properly denied defendant leave to file a successive postconviction petition where defendant's life sentence did not violate the proportionate penalties cause, because "defendant was an adult, an active participant in the crimes, and received a discretionary sentence").

¶ 43     In sum, we find that the defendant's 60-year sentence does not violate the proportionate penalties clause where (1) the defendant was not a juvenile at the time of the offense; (2) he received a discretionary 60-year sentence; (3) his conviction was based on his direct participation in the crime of first degree murder, and not based on a theory of accountability; and (4) the trial court imposed the defendant's sentence after considering information from the PSI and argument that concerned his youth and rehabilitative potential. Because the defendant's sentence violated neither the eighth amendment to the United States Constitution nor the proportionate penalties clause of the Illinois Constitution, we find the circuit court did not err in denying him leave to file a successive postconviction petition.

¶ 44                                B. Actual Innocence

¶ 45    The defendant also claims that he is entitled to further postconviction proceedings on his claim of actual innocence based on the fact that "his conviction rested on testimony about Shaken Baby Syndrome that could be deemed unreliable by a jury in light of the new scientific and legal developments cited in his petition." The State responds that the defendant's successive petition and supporting documentation fail to set forth a colorable claim of actual innocence. For the reasons that follow, we agree with the State.

¶ 46    In addition to the cause-and-prejudice test set forth in the statute, there is a second basis, established by the courts, on which a defendant can seek leave to file a successive postconviction petition: where there has been a fundamental miscarriage of justice, which can only be established where defendant makes a showing of actual innocence. *Edwards*, 2012 IL 111711, ¶ 23. A showing of actual innocence can only be made by the presentation of newly discovered evidence of such conclusive character that it would probably change the result on retrial. *Id*. ¶ 32. A postconviction petitioner must submit with his motion for leave to file a successive postconviction petition sufficient documentation to allow the circuit court to determine whether such a showing has been made. *Id*. ¶ 24. Thus, leave to file a successive postconviction petition on the basis of a claim of actual innocence should be granted only when the supporting documentation "raises the probability that it is more likely than not that no reasonable juror would have convicted [defendant] in the light of the new evidence." (Internal quotation marks omitted.) *Id*.

¶ 47    "Substantively, the evidence in support of the claim must be newly discovered; material and not merely cumulative; and 'of such conclusive character that it would probably change the result on retrial.' " *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009) (quoting *People v. Morgan*, 212 Ill. 2d 148, 154 (2004)). Whether newly discovered evidence is of such conclusive character that it

15

would probably change the result on retrial is the most important element of any actual-innocence claim. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). When considering whether newly discovered evidence is of such conclusive character that it would probably change the result on retrial, "conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result." *People v. Coleman*, 2013 IL 113307, ¶ 96. Additionally, "[e]vidence of actual innocence must support total vindication or exoneration, not merely present a reasonable doubt." *People v. Adams*, 2013 IL App (1st) 111081, ¶ 36. Here, we cannot conclude that the evidence relied on by the defendant is of such conclusive character that it would probably change the result on retrial.

¶ 48    The medical evidence presented at the defendant's trial proved that Z.H. suffered a fracture to her skull, swelling on the brain, retinal hemorrhaging, and swelling and bruising of the head. She also suffered a broken rib, a laceration to the spleen, and internal bleeding consistent with blows or kicks to the abdomen. The medical examiner testified that Z.H. died from a closed head injury *and* blunt trauma to the abdomen. This conclusion was consistent with the defendant's own admission that he punched Z.H. in the stomach two or three times and hit her in the head, knocking her off the counter and onto the concrete floor. Z.H. was limp and unresponsive immediately after this fall, and she never recovered.

¶ 49    Based on the foregoing, even if we were to assume *arguendo* that the defendant's successive petition and supporting documentation satisfy the other requirements of an actual-innocence claim, we find that it is not of such conclusive character that it would probably change the result on retrial. The evidence proffered by the defendant falls far short of establishing his "total vindication or exoneration" (*id.*), and "when considered along with the trial evidence," we cannot conclude that the new research on shaken baby syndrome "would probably lead to a

16

different result" (*Coleman*, 2013 IL 113307, ¶ 96). "[A]ctual innocence requires that a defendant be free of liability not only for the crime of conviction, but also of any related offenses." (Internal quotation marks omitted.) *People v. Wingate*, 2015 IL App (5th) 130189, ¶ 32. Thus, even if the defendant were able to establish that the alleged scientific and legal developments constitutes newly discovered evidence, his claim of actual innocence would still fail as a matter of law. See *Edwards*, 2012 IL 111711, ¶¶ 40-41 (similarly finding).

¶ 50    Finally, the defendant contends that his trial counsel was ineffective for failing to investigate and defend him using what research on shaken baby syndrome was available at the time of trial and that his direct-appeal counsel was ineffective for failing to raise the issue of trial counsel's ineffectiveness on direct appeal.

¶ 51    Claims of ineffective assistance of counsel are evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted by the supreme court in *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984). To prevail under *Strickland*, a defendant must demonstrate (1) that counsel's performance was objectively unreasonable under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Harris*, 225 Ill. 2d 1, 20 (2007). A reasonable probability that the result of the proceeding would have been different is a probability sufficient to undermine confidence in the outcome of the proceeding. *People v. Colon*, 225 Ill. 2d 125, 135 (2007). Because a defendant's ineffective-assistance-of-counsel claim will fail if either prong of the *Strickland* test is not met, a reviewing court need not determine whether counsel's performance was deficient before determining whether he was prejudiced. *People v. Perry*, 224 Ill. 2d 312, 342 (2007).

¶ 52 We initially note that the defendant's ineffective-assistance-of-counsel claims relate to shaken baby syndrome research that existed at the time of the defendant's trial and could have been presented in his initial postconviction proceedings. There was nothing preventing the defendant from raising them in the first proceedings, in which he asserted other claims of ineffective assistance of counsel. As such, the defendant has failed to demonstrate cause for his failure to bring these claims in the initial postconviction proceedings. See 725 ILCS 5/122-1(f) (West 2016); *Wrice*, 2012 IL 111860, ¶ 48.

¶ 53 Furthermore, there can be no prejudice with respect to these claims. As previously stated, the medical examiner testified at the defendant's trial that Z.H. died from a closed head injury *and* blunt trauma to the abdomen. This conclusion was supported by (1) the medical evidence showing that Z.H. suffered a fracture to her skull, swelling on the brain, retinal hemorrhaging, swelling and bruising of the head, a broken rib, a laceration to the spleen, and internal bleeding consistent with blows or kicks to the abdomen and (2) the defendant's own admission that he punched Z.H. in the stomach two or three times and hit her in the head, knocking her off the counter and onto the concrete floor. In light of the overwhelming evidence of the defendant's guilt, independent of the shaken baby syndrome diagnosis, we find that there is no reasonable probability that the result of the proceeding would have been different if trial counsel had presented evidence challenging it. Accordingly, trial counsel will not be found ineffective for failing to present such evidence, and direct-appeal counsel will not be found ineffective for failing to raise the issue on direct appeal.

¶ 54                                III. CONCLUSION

¶ 55 We affirm the denial of the defendant's motion for leave to file a successive postconviction petition.

¶ 56 Affirmed.

18

2020 IL App (5th) 170462

NO. 5-17-0462

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 04-CF-639 |
| | ) | |
| MICHAEL GREEN, | ) | Honorable |
| | ) | Jennifer L. Hightower, |
| Defendant-Appellant. | ) | Judge, presiding. |

**Rule 23 Order Filed:** June 10, 2020
**Motion to Publish Granted:** July 2, 2020
**Opinion Filed:** July 2, 2020

**Justices:** Honorable Thomas M. Welch, P.J.

Honorable Judy L. Cates, J., and
Honorable James R. Moore, J.,
Concur

**Attorneys for Appellant** James E. Chadd, State Appellate Defender, Ellen J. Curry, Deputy Defender, Elizabeth M. Crotty, Assistant Appellate Defender, Office of the State Appellate Defender, Fifth Judicial District, 909 Water Tower Circle, Mt. Vernon, IL 62864

**Attorneys for Appellee** Hon. Thomas D. Gibbons, State's Attorney, Madison County Courthouse, 157 North Main Street, Suite 402, Edwardsville, IL 62025; Patrick Delfino, Director, Patrick D. Daly, Deputy Director, Valerie A. Ozment, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, 730 East Illinois Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864