NOTICE

Decision filed 04/20/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180475-U

NO. 5-18-0475

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 96-CF-100 |
| | ) | |
| BOBBY O. WILLIAMS, | ) | Honorable |
| | ) | Julie K. Katz, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice Boie and Justice Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not error in finding defendant failed to prove prejudice regarding his *Miller* claim where the record shows that the court considered his youth and its attendant circumstances in imposing a natural life sentence.

¶ 2    This court is no stranger to the facts of this case, as defendant has appealed his conviction and sentence several times. *People v. Williams*, 193 Ill. 2d 1 (2000); *People v. Williams*, No. 5-08-0459 (2011) (unpublished order under Illinois Supreme Court Rule 23); *People v. Williams*, 2014 IL App (5th) 120385-U. The facts set forth below are largely recounted from those opinions and limited to that relevant to defendant's current appeal.

1

¶ 3                                     BACKGROUND

¶ 4     On November 3, 1994, Sharon Bushong was shot to death during a robbery at a convenience store in Belleville where she worked as a clerk. Bushong was the only clerk working at the time of the robbery. A spent cartridge case from a .38-caliber pistol fired during the robbery was retrieved from the scene, and a .38-caliber bullet was recovered from Bushong's body during her autopsy.

¶ 5     The surveillance videotape recorded by the store's security cameras, which was played to the jury during defendant's trial, showed two African American males entering the store at 12:49 a.m. on the morning of the murders. Neither man's face was visible, as the shooter wore some type of light-colored garment over his head and the other man covered his face with his hands and shirt. After Bushong opened the drawer, the man with the garment over his head shot Bushong in the head. The man then took cash out of the register. During this time, the second man can be seen leaning over and reaching into a display rack filled with potato chips. After the shooter removed the money from the cash register, the two men exited the store.

¶ 6     On February 15, 1995, defendant was arrested. At the time of his arrest, defendant was carrying a .38-caliber pistol, which a forensic firearms examiner later determined was the gun used to shoot Bushong. At trial, the State also presented other evidence, mostly through witness testimony, indicating that defendant was the shooter. Defendant did not testify but defense counsel presented witnesses whose testimony indicated a friend of defendant's committed the murder. After hearing all the evidence, the jury

convicted defendant of first degree murder and the cause proceeded to a death penalty eligibility hearing.

¶ 7    Following a hearing in aggravation and mitigation, the jury found that there were no factors sufficient to preclude the imposition of the death penalty and sentenced defendant to death. On direct appeal, the Illinois Supreme Court affirmed defendant's conviction for first degree murder but vacated the death sentence and remanded for resentencing. *Williams*, 193 Ill. 2d 1, 47 (2000).

¶ 8    On January 10, 2003, before defendant was resentenced, then Governor George Ryan issued a commutation order that removed the death penalty as a sentencing option, making natural life in prison without the possibility of parole the maximum sentence which could be imposed. On April 23, 2004, the State filed a notice that it intended to seek an extended-term sentence at the resentencing hearing.

¶ 9    After defendant filed a series of unsuccessful motions, a sentencing eligibility hearing was eventually conducted on April 14-15, 2008. During the hearing, the court admitted into evidence and published to the jury a certified copy of the indictment and the original verdict of guilt, over defendant's objection.

¶ 10    The State presented the prior testimony of Shirley Etherton, who was the store manager at the time of the murder. Etherton died after the first trial and, therefore, was unavailable to testify. After the murder, Etherton conducted an inventory of the store and determined that $77 was missing. The parties stipulated that the videotape admitted into evidence was the original videotape of the murder, and the relevant portions were played for the jury.

3

¶ 11    The State rested, and the defense rested without presenting any evidence. The jury found defendant eligible for an extended-term sentence. The court ordered a presentence investigation report and the cause proceeded to a sentencing hearing on June 17, 2008.

¶ 12    At the sentencing hearing, a presentence investigation report, dated May 8, 2008, was admitted. The State orally amended the report to reflect that defendant's previous conviction for unlawful possession of firearms was a Class A misdemeanor, and not a felony.

¶ 13    In aggravation, the State called Howard Morgan, the victim's father, to testify. It also admitted Morgan's victim impact statement. Morgan testified to the impact of the victim's death on her son, who now needs counseling, and her brother, who was very close with the victim. He also explained the pain he endured from burying his daughter and the obvious absence of her joyful personality from their family.

¶ 14    In mitigation, defense counsel called Reverend Martin Howlett Sr. to testify. He informed the court that he conducted conflict resolution and anger management training for inmates and first encountered defendant while incarcerated. He had interacted with defendant at least once a week for almost three years. In that time, he was impressed with defendant's strength and ability to diffuse some of the other inmates' interactional conflict. Reverend Howlett found defendant was extremely intelligent and was able to help other inmates express themselves. He further believed defendant had a gift in helping other inmates express themselves in a calm manner and remain truthful. He never thought defendant pitied his condition and always saw him trying to better himself.

¶ 15   Defense counsel also called Lieutenant Steven Saunders, who was familiar with defendant through the services he provided at the jail as the program and service coordinator. He testified to knowing defendant since he first came to the jail, and that defendant is not disruptive or problematic. He also knew defendant was involved in several classes, including evangelism and anger management. He further testified to a story in which defendant gave advice to a juvenile defendant, who was to face a trial soon, about his experience in jail, how to stay peaceful, and how to control his behavior.

¶ 16   The parties stipulated that the defense's other witnesses, Susan Schuchmann, Jason Moyer, and Nancy Sutherland, would also testify similarly to Reverend Howlett and Lieutenant Saunders in that defendant had demonstrated good behavior since being incarcerated.

¶ 17   In further support of mitigating evidence, defense counsel also admitted several affidavits and a series of certificates that defendant achieved while imprisoned. One affidavit was submitted by Shermane Turner, defendant's mother. Shermane stated that when defendant was young, she was raped. Afterwards, his father was overcome with guilt that turned into anger towards Shermane and accusations that she provoked the intruder to rape her. From then, he was a very jealous man and, after some time, began using crack cocaine. While defendant's father was not abusive towards his children, he became very abusive towards Shermane such that she was forced to move herself and the children out. Eventually, defendant's father found them and, unbeknownst to the children, he would break into the house and rape her while their children were home. She left and returned to a relationship with defendant's father several times. She further stated

that there is a history of drug and alcohol use on both sides of defendant's family, as well as abuse and incest on his father's side.

¶ 18     Shermane also averred that although she lived in a one-bedroom house with five children, she allowed other families to move in. Consequently, her children were often left without food and with a destroyed home. Explaining the dangerous and unpredictable environment of East St. Louis, where they lived, she stated, "Our daily lives consisted of shoot-outs on the store parking lots, drive-bys, drug addicts, drug dealers, gang bangers, dysfunctional families, dysfunctional schools, [and] dysfunctional communities." While defendant had been an average student who graduated from high school on time, the one high school available to defendant provided a poor education.

¶ 19     Shermane further stated that after the death of his father, defendant became hurt and angry. She therefore encouraged defendant to enter the Marines right after high school because she "didn't want [him] on the streets" in the no-win situation of East St. Louis and wanted to give him a chance at life. About a year after entering the Marines, defendant was honorably discharged after he was diagnosed with asthma. Frustrated and discouraged, and now in need of a male role model more than ever, he began hanging out with one of his paternal uncles who happened to be a drug dealer. Despite her warnings, naïve defendant continued to follow the pathway of destruction. According to Shermane, defendant had no prior criminal record. Shermane believed that the murder of Bushong was "out of character" for defendant and "just not like him." She also did not believe that defendant was capable of doing such a demonic thing.

6

¶ 20   Several other affidavits, all from defendant's family on both his mother and father's sides, were also admitted. Collectively, the affidavits spoke to the poor home environment that defendant endured. He was often without food and water. Further, defendant's school was more of a war zone than a safe haven. His paternal uncle explained that defendant came into possession of a gun to protect himself, after a gang shot out defendant's car windows with him barely escaping with his life. All the affidavits also indicated that defendant was a caring and respectable person who was not capable of committing this crime. His maternal aunts believed defendant was in this situation due to hanging with the wrong crowd after his father's death, with one aunt asserting that defendant was only trying to cover for his uncles and cousins, all of which have a criminal history.

¶ 21   Defendant also provided a statement in allocution. He first gave his condolences to the victim's family, noting that he understood their anger and wish to seek justice. Defendant then provided examples of other senseless murders where the defendants received sentences of 33 years or less. He questioned the court as to why persons who committed similar crimes were subjected to less severe punishments than him, urging the court to stick to the precedent it set in sentencing these types of crimes. He further stated, "I was a child when I could have gotten convicted. I was a child, I didn't understand nothing about life. Now I understand about life, your Honor."

¶ 22   The State argued the aggravating factor to deter others from committing the same crime (730 ILCS 5/5-5-3.2(a)(7) (West 1994)) was particularly pertinent here and that the seriousness of the crime was the most important factor in determining the appropriate

sentence. Specifically, the State explained that the nature of the offense was particularly senseless and horrific, as observed by the Illinois Supreme Court in defendant's previous appeal. The attack was unprovoked, and defendant killed the victim as soon as she opened the cash register although she would have never been able to identify defendant due to his face covering.

¶ 23    Defense counsel argued factors in mitigation (730 ILCS 5/5-5-3.1(a)(7)-(9) (West 1994)) weighed in favor of a lesser sentence than life. This was the only crime defendant had committed at this point. Thereafter, defendant rigorously adhered to the regiment set forth for him. Defense counsel further eluded that defendant's actions were the result of his circumstances. Specifically, he contended that defendant wanted to serve his country and would be in a different place if he did not have asthma, which was the reason the Marine Corps discharged defendant a mere five months before this incident. Before the commission of this crime, he led a law-abiding life. His conduct throughout his incarceration, along with his character and attitude illustrated by the supporting affidavits, demonstrated that he would lead a law-abiding life once released. Counsel argued that he was told to ask for 20 years but believed anywhere from 45 to 60 years would be an appropriate sentence.

¶ 24    The court sentenced defendant to natural life in prison. In doing so, it stated:

> "Mr. Williams grew up in a bad setting. And, apparently, Mr. Williams, you were one of those kids that were doomed from the start, although you had a mother that loved you, there was little money, little support, little

8

education. You could argue that society failed you. Probably true. Society, on the other hand, Governor Ryan, saved your life.

\*\*\* [Y]ou don't have a job, you don't have money, you tried to make it, the Marines threw you out; and so, I'll give you for argument's sake the fact that society's dumped on you. You don't have a job, everybody's got to live, you're going to go in and take somebody else's money. It's a crime. In the big picture of things, not necessarily the worse [*sic*] crime that one could commit. Taking somebody else's property is not good, but it's a property crime. You chose to elevate it first into a robbery. But you could have gone in with simply your fist and put her up against the wall and say give me the money. I bet you would have got it. She'd be alive. You could have gone in with a baseball bat, done the same thing, left with the money. She would still be alive. You could have gone in with a gun and a rope, tied her up, put her in the cooler, called the police on the way out, let them know she's in the cooler. At any rate, there's a whole scenario of facts that you could have chosen and gone in and got the money, because society has dumped on you, and she would still be alive. \*\*\* But instead, you went in with an intent to kill. And that's why we're here today.

I cannot justify your actions. \*\*\*

\* \* \*

And so, with—with no particular vengeance, simply—simply because crimes of this nature with aggravating factors deserve punishment for the

9

act committed, I'm going to deny your request and sentence you to prison for the rest of your life."

¶ 25 Defendant filed a motion to reconsider, and a hearing was held on July 31, 2008. Defense counsel argued, *inter alia*, that defendant had no criminal history before this crime, and the misdemeanor gun charge was after the alleged date in question. The court subsequently entered an order correcting the fact that defendant had no criminal history before this incident but determined the correction did not affect his view of the law or facts. Therefore, the court denied defendant's motion to reduce the sentence. Another panel from this appellate district affirmed defendant's sentence on appeal. *Williams*, No. 5-08-0459 (2011) (unpublished order under Illinois Supreme Court Rule 23).

¶ 26 On June 4, 2012, defendant filed a *pro se* petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)), alleging unrelated matters. The trial court dismissed the petition as frivolous and patently without merit, which was affirmed on appeal. *Williams*, 2014 IL App (5th) 120385-U.

¶ 27 On May 22, 2018, defendant filed a *pro se* motion for leave to file a successive postconviction petition. Defendant's motion contended that his sentence violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution where the sentencing court failed to consider defendant's youthful age of 19 years old at the time of the offense. Defendant further argued that he failed to set forth this argument because *Miller v. Alabama*, 567 U.S. 460 (2012) (holding a sentencing scheme mandating a life term of imprisonment without the possibility of parole violate the eighth amendment for juveniles) was not decided until a

few weeks after his last postconviction petition. He attached emerging scientific studies which indicated that the brains of young adults are more similar to juveniles than fully mature adults and that people's brains are still developing into the mid-twenties. Some of the studies also concluded young adults who are subjected to brief and prolonged negative emotional arousal resemble juveniles in immaturity, impulsivity, and poor self-control.

¶ 28 Defendant argued that the court acknowledged that evidence presented at his sentence hearing demonstrated defendant was subjected to prolonged negative emotional arousal. Accordingly, defendant should have had a reduced culpability and a greater opportunity for reform. Because the court was unaware of the science described above, it did not take into consideration that prolonged negative arousal slowed defendant's maturity, causing impulsivity and poor self-control, in imposing the natural life sentence which violated both the state and federal constitutions.

¶ 29 On September 10, 2018, the court denied defendant's motion for leave to file a successive postconviction petition. The trial court found, although defendant could have raised the concerns of his youth in prior appeals and petition, the subsequent decision of *Miller* would have given his claim credence and therefore defendant established cause. The court found, however, defendant failed to establish prejudice as the overwhelming authority has declined to extend *Miller* protections to young adult offenders. It further found that the facts of defendant's case are distinguishable from the one appellate court case that had allowed a young adult defendant's use of *Miller* to challenge his sentence, See *People v. House*, 2015 IL App (1st) 110580. Because it found *Miller* inapplicable,

the court determined *res judicata* barred addressing any claim that his sentence was excessive, as this appellate district had already upheld his sentence on direct appeal.

¶ 30                                              ANALYSIS

¶ 31    The Act provides a procedural mechanism through which criminal defendants can assert that their federal or state constitutional rights were substantially violated in the proceedings that resulted in their conviction. 725 ILCS 5/122-1(a)(1) (West 2016). The Act generally contemplates the filing of one postconviction petition. *Id.* § 122-1(f); *People v. Davis*, 2014 IL 115595, ¶ 14. As such, a defendant must obtain leave of court to file a successive petition. 725 ILCS 5/122-1(f) (West 2016). To do so, a defendant must establish that some objective factor impeded his or her ability to raise the specific claim of error during the initial postconviction petition and that the error "so infected the trial that the resulting conviction or sentence violated due process." *Id.* This is otherwise known as the "cause and prejudice" test. *Davis*, 2014 IL 115595, ¶ 14.

¶ 32    On appeal, the State does not challenge the court's determination that defendant established cause. Accordingly, the only issue on appeal is whether defendant established prejudice.

¶ 33    From the outset, we reject defendant's as-applied claim as not legally cognizable to the extent that it relies solely on his age. Under *Miller*, a mandatory life sentence without the possibility of parole violates the eighth amendment for juvenile offenders. The Supreme Court has consistently drawn the line between juveniles and adults at the age of 18 and has never extended its reasoning underlying *Miller* nor its protections to young adults age 18 or over. *People v. Harris*, 2018 IL 121932, ¶¶ 58, 61.

12

¶ 34    Although *Miller* protections cannot generally be extended to those age 18 or over based on their age alone, the Illinois Supreme Court has noted the possibility of asserting an as-applied *Miller* claim. *Id.* ¶¶ 46, 48. Such claim requires a defendant to demonstrate how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to defendant's specific facts and circumstances. *Id.* ¶ 46; see *People v. White*, 2020 IL App (5th) 170345, ¶ 24.

¶ 35    In this respect, defendant attached scientific studies that conclude brief and prolonged negative emotional arousal impacts a person's maturity, impulsivity, and self-control, making their brain development to be more like a juvenile's than an adult's. Without specification, defendant asserts that evidence at the sentencing hearing demonstrated that he was subjected to prolonged negative emotional arousal. Thus, he argues prejudice is established because the sentencing court lacked knowledge of the above scientific studies before sentencing him to natural life imprisonment.

¶ 36    The State asserts that this court should follow *People v. Green*, 2020 IL App (5th) 170462, and find defendant's claim not legally cognizable due to his direct participation in murder and discretionary nature of his sentence. In *Green*, another panel from this appellate district affirmed the denial of a motion for leave to file a successive postconviction petition, in which a 22-year-old defendant alleged his 60-year *de facto* life sentence violated the eighth amendment and proportionate penalties clause as applied to him. *Id.* ¶¶ 19, 27. The *Green* court reasoned the facts that Green was an adult who directly participated in the murder and received a discretionary 60-year sentence precluded him from asserting a *Miller* claim. *Id.* ¶¶ 35, 37. The court also found the trial

court imposed defendant's sentence after considering evidence and argument that concerned his youth and rehabilitative potential. *Id.* ¶ 43. It further noted that while the Illinois Supreme Court indicated that a young adult defendant could raise an as-applied *Miller* claim in a postconviction petition, "the court made no finding as to how successful the claim would be." *Id.* ¶ 41.

¶ 37    In support of his as-applied claim, defendant contends this court is free to reject the reasoning in *Green*, because the opinion of one panel of the appellate court is not binding on other panels of the same appellate district. *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008). Instead, we should follow the reasoning in *People v. Ruiz*, 2020 IL App (1st) 163145, which allowed a defendant who committed murder when he was 18 years old leave to file a successive petition on the basis that his 40-year *de facto* life sentence violated the proportionate penalties clause as applied to him. Contrary to *Green*, *Ruiz* found no principled reason to disallow a young adult's as-applied *Miller* claim based on the level of participation in the crime or discretionary nature of the sentence. *Ruiz*, 2020 IL App (1st) 163145, ¶¶ 37-38.

¶ 38    Defendant further reasons that there is ample support, even after the publication of *Green*, for the contention that defendants who directly participated in a crime and received a discretionary sentence may still establish the required prejudice for leave to file a successive postconviction petition. See *People v. Daniels*, 2020 IL App (1st) 171738, ¶ 34; *People v. Ross*, 2020 IL App (1st) 171202, ¶ 30; see also *People v. Franklin*, 2020 IL App (1st) 171628. Also, unlike the 22-year-old defendant in *Green*, defendant was only 19 years old at the time of offense.

14

¶ 39   Apparent from the parties' authorities, there is some tension among the appellate courts as to whether a young adult defendant who directly participates in the crime and receives a discretionary sentence is able to assert an as-applied *Miller* challenge. However, we need not address that issue in this case because, under the guidance of a recent supreme court opinion, *People v. Lusby*, 2020 IL 124046, defendant nevertheless fails to prove prejudice.

¶ 40   In *Lusby*, a juvenile defendant motioned for leave to file a successive postconviction petition which asserted his *de facto* life sentence violated the eighth amendment under *Miller*. *Lusby*, 2020 IL 124046, ¶ 22. The State conceded that defendant made a *prima facie* showing of cause but argued he failed to demonstrate prejudice where the trial court considered "youth-related factors." *Id.* ¶ 30.

¶ 41   After a review of relevant legal principles underlying *Miller* and its progeny, the court explained that *Miller* was concerned with the removal of youth and its attendant circumstances from the balance of proportionately punishing juvenile offenders. *Id.* ¶¶ 32-33. A mandatory life sentence " 'misses too much' " because the court cannot account for such factors. *Id.* ¶ 33. However, unlike mandatory sentences, where a court can and does consider youth and its attendant circumstances in imposing a life sentence, it does not "miss too much." *Id.*

¶ 42   "*Miller* did not foreclose the possibility of discretionary life sentences for juveniles" but instead requires courts to consider youth and its attendant circumstances before imposing a life sentence. *Id.* The court therefore found no prejudice where the trial court made an informed decision to impose a life sentence on an incorrigible defendant

15

by considering evidence and argument related to the *Miller* factors. *Id.* ¶ 35. As such, a defendant fails to prove the required prejudice for a *Miller*-based claim if the record demonstrates that the sentencing court considered evidence and argument, from the trial and sentencing hearing, related to the *Miller* factors. *Id.* ¶¶ 38-52.

¶ 43    Defendant here fails to argue that evidence related to the *Miller* factors was not presented to the court. He instead contends that he is entitled to a new sentencing hearing because the court lacked knowledge of the emerging scientific studies concerning the immaturity that results from prolonged negative emotional arousal, which defendant was subjected to as a child and teen. Defendant fails to cite any authority suggesting *Miller* requires courts to consider specific studies regarding the mentality of juveniles or young adults. While the creation of *Miller* protections stemmed from scientific studies demonstrating the pliability of a juvenile's mind, we do not read *Miller* to require courts to consider such studies.

¶ 44    Rather, once *Miller* applies, it requires only that courts consider youth and its attendant circumstances before determining "defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *People v. Holman*, 2017 IL 120655, ¶ 46. The Illinois Supreme Court has specified youth and its attendant circumstances, or the *Miller* factors, as:

> " '(1) the juvenile defendant's chronological age at the time of the offense
> and any evidence of his particular immaturity, impetuosity, and failure to
> appreciate risks and consequences; (2) the juvenile defendant's family and
> home environment; (3) the juvenile defendant's degree of participation in

the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation.' " *Lusby*, 2020 IL 124046, ¶ 34 (quoting *Holman*, 2017 IL 120655, ¶ 46).

We look to the totality of the circumstances to determine whether the sentencing court considered evidence and argument relating to these factors before concluding a life sentence was appropriate. *Id.* ¶ 35. "No single factor is dispositive." *Id.* Assuming *Miller* is applicable here, we find the sentencing court considered youth and its attendant circumstances.

¶ 45   1. Defendant's Chronological Age at the Time of Offense and Any Evidence of His Particular Immaturity, Impetuosity, and Failure to Appreciate Risks and Consequences

¶ 46   Based on his birth certificate admitted into evidence, defendant was 19 years old when he murdered Bushong. At the sentencing hearing, defendant argued that "he was just a child" at the time of the offense but now understands life. The court noted that society had dumped on defendant but that his intelligence and ability to present his attorney significant evidence in his defense demonstrated his ability to be in a good position with a good job to support his family.

¶ 47                     2. Defendant's Family and Home Environment

¶ 48   Defense counsel submitted several affidavits which illustrated defendant's home environment as well as the community he grew up in. Although defendant's mother

17

revealed that defendant received love growing up, the affidavits depicted his home environment as poor and unstable. He was often without food, water, and/or electricity. They also indicated that defendant's community and school were fraught with violence and crime. Evidence regarding defendant's family history of mental illness, addiction, and abuse was also presented to the court.

¶ 49    3. Defendant's Degree of Participation in the Homicide and Any Evidence of Familial or Peer Pressures That May Have Affected Him

¶ 50    The evidence at trial and defendant's subsequent conviction showed that defendant directly participated in the murder of Bushong. After Bushong opened the cash register, defendant shot Bushong in the head despite having his face concealed.

¶ 51    Defense counsel presented evidence that defendant's actions were a cover-up for his uncles and cousins, who he confided in after the loss of his father. Other evidence presented to the court indicated that defendant's actions were the result of "hanging around the wrong crowd."

¶ 52    4. Defendant's Incompetence, Including His Inability to Deal With Police Officers or Prosecutors and His Incapacity to Assist His Own Attorneys

¶ 53    There was no evidence presented at trial regarding defendant's incompetence. The presentence investigation (PSI) report indicated that defendant graduated high school, being 131st out of 355 students. The PSI report also stated that defendant admitted daily use of alcohol and marijuana prior to his arrest, and that he never received substance abuse treatment. The report did not mention any past or present mental health treatment or institutionalization but mentioned that defendant asserted his father and uncle had

18

undocumented mental issues. Before announcing defendant's sentence, the court noted defendant's ability to present his attorney significant evidence in his defense.

¶ 54                    5. Defendant's Prospects for Rehabilitation

¶ 55    The PSI report declined to suggest any specific recommendation but noted that defendant could benefit from job training due to his lack of employment since being incarcerated. The parties agreed that defendant should be sentenced to prison but differed on the length, with the State suggesting a life term and defense counsel suggesting 45 to 60 years, both of which are *de facto* life sentences. See *People v. Buffer*, 2019 IL 122327, ¶ 40 (*de facto* life sentence is more than 40 years).

¶ 56    In announcing defendant's sentence, the court stated that it considered all the evidence in the case, including the presentence investigation report, financial impact of incarcerating the defendant, defendant's comments, and the evidence presented at the sentencing hearing as well as the arguments in aggravation and mitigation. The record shows that substantial evidence regarding defendant's upbringing and poor home environment, and the other *Miller* factors, was presented. The court sympathized that defendant was placed in an unfortunate position in society, which put him at a disadvantage in life. However, it found—based on the nature of the crime and factors in aggravation—it could not excuse defendant's actions and sentenced him to life.

¶ 57    On appeal, defendant fails to present any new evidence that the court should have considered relating to these factors. Moreover, "defendant had every opportunity to present evidence to show that his criminal conduct was the product of immaturity and not incorrigibility" at the sentencing hearing and the hearing on defendant's motion to

19

reconsider. *Holman*, 2017 IL 120655, ¶ 49 (citing *Montgomery v. Louisiana*, 577 U.S. 190, 213 (2016) (juveniles facing life sentences "must be given the opportunity to show their crime did not reflect irreparable corruption")). Defendant's discretionary life sentence therefore passes constitutional muster under *Miller*, assuming it applies here. See *Lusby*, 2020 IL 124046, ¶¶ 38-52; see also *Holman*, 2017 IL 120655, ¶¶ 48-50.

¶ 58    As a final note, because we find defendant's sentencing hearing was *Miller*-compliant, his remaining arguments resemble an excessive sentence challenge which has been previously addressed on direct appeal. *Williams*, No. 5-08-0459 (2011) (unpublished order under Illinois Supreme Court Rule 23). Accordingly, we are barred under principles of *res judicata* from addressing such claim. *People v. Stoecker*, 2020 IL 124807, ¶ 29 (final judgment rendered by a court of competent jurisdiction on the merits constitutes an absolute bar to a subsequent action involving the same claim).

¶ 59                              CONCLUSION

¶ 60    Assuming *Miller* protections apply to defendant, the record demonstrates that the sentencing court considered defendant's youth and its attendant circumstances before imposing a life sentence. Accordingly, the circuit court's denial of defendant's leave to file a successive postconviction petition is affirmed for failing to establish prejudice.

¶ 61    Affirmed.