NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230058-U

NO. 4-23-0058

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 2, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| MARK RUNYON, | ) | No. 18CF290 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John P. Vespa, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction and 60-year sentence for first degree murder were upheld where (1) the trial court properly exercised its discretion in finding defendant was restored to fitness before trial, (2) the circumstantial evidence of his identity was sufficient to support his conviction, (3) his trial counsel's performance was not deficient and thus not constitutionally ineffective, and (4) his sentence was not manifestly disproportionate to the seriousness of his offense.

¶ 2    A jury convicted defendant Mark Runyon of first degree murder (720 ILCS 5/9-1(a)(2) (West 2018)) for killing his father, Frank Runyon. The trial court sentenced defendant to 60 years in prison. On appeal, defendant argues that (1) the court erred by finding he was restored to fitness before trial, (2) the State's circumstantial evidence was insufficient to identify him as the person who committed the murder, (3) his trial counsel was ineffective for allowing the jury to hear two pieces of improper evidence and for purportedly conceding in her closing

argument that defendant punched his father, and (4) his sentence is excessive. We disagree and affirm.

¶ 3                                    I. BACKGROUND

¶ 4            On the morning of May 2, 2018, Frank Runyon, age 74, was found severely injured on the floor of his bedroom. Frank was immediately taken to the hospital but died of his injuries on May 7, 2018. The only other occupant of the house when Frank was discovered was his son, defendant Mark Runyon, then age 38.

¶ 5            Defendant was charged with first degree murder for knowingly striking and causing the death of Frank, a person over 60 years of age, knowing that his acts created a strong probability of death or great bodily harm. Defendant was also charged with criminal neglect of an elderly person (720 ILCS 5/12-4.4a(b)(1) (West 2018)), but this charge was later dropped.

¶ 6                                 A. Pretrial Proceedings

¶ 7            At defendant's first appearance and arraignment in May 2018, he refused to say anything except "I plead the fifth." The trial court appointed the public defender's office to represent defendant, and he entered pleas of not guilty. At future proceedings, defendant was more cooperative and communicated with his counsel and the court.

¶ 8            Assistant Public Defender Jennifer Patton first appeared on defendant's behalf in January 2019 and remained his counsel through the rest of proceedings below. In May 2019, she informed the trial court that she had a *bona fide* doubt about defendant's fitness, so the court ordered a fitness examination and report. See 725 ILCS 5/104-10 *et seq.* (West 2018) (prescribing procedures to determine fitness for trial). After a fitness hearing, the court found defendant unfit and remanded him to the custody of the Department of Human Services (DHS) for inpatient treatment to render him fit to stand trial. No appeal was taken from the order finding him unfit.

¶ 9         In January 2020, the trial court received a two-page progress report from DHS pursuant to section 104-18 of the Code of Criminal Procedure of 1963 (725 ILCS 5/104-18 (West 2018)). The report was signed by psychiatrist Gabriel Valdes and social worker Jolene Carter, who opined on behalf of defendant's treatment team that he was fit to stand trial. The report described their clinical findings and defendant's response to treatment, noting that he was taking olanzapine, sertraline, and lorazepam as prescribed. Based on this report, the court ordered defendant returned to the custody of the Peoria County jail. After holding a fitness restoration hearing, the court found defendant fit to stand trial. The court also ordered an examination into defendant's sanity at the time of the offense, but this examination was never completed.

¶ 10        After a number of continuances, defendant's jury trial began in October 2022.

¶ 11                                    B. Trial

¶ 12        The following facts are summarized from the testimony and exhibits introduced at trial.

¶ 13                              1. *Timeline of Events*

¶ 14        On the evening of May 1, 2018, Frank's neighbor and friend Arkeshia Williams came to visit him at his house along with some members of Frank's family, although she could not remember who was there. Williams testified that Frank was probably drinking because he usually had a beer or two at night. Williams could not remember when she left.

¶ 15        Frank's granddaughter Sariah visited his house between 9 and 10 p.m. to take a shower. Sariah spent approximately 30 minutes at the house and did not see defendant while she was there. Before she left, she opened Frank's bedroom door to check on him and saw him alive and watching TV in his bed. Sariah testified that she was accompanied by either her sister or her

brother on her visit, but she could not remember which. Sariah did not testify whether she locked the house when she left.

¶ 16        At 8:21 a.m. the following day, a 46-second voicemail message was left on the phone of the best friend of Frank's daughter Stacey; the call originated from Frank's cellphone. A cybercrimes detective for the Peoria Police Department testified that he was unable to clarify what was said on the message, which was not played for the jury.

¶ 17        Williams visited Frank's house sometime between 8 and 9:45 a.m. because she had lost her phone and wanted to call it from Frank's phone to find it. She testified that although Frank had a habit of sitting out on his porch in the morning, she did not see him that day. Williams knocked on the front door for 5 to 10 minutes and thought she saw movement behind the curtain in the window of Frank's bedroom, which was just to the left of the front door. She sat and waited for another two to three minutes and knocked twice more, but no one came to the door, so she left. At no point did Williams try to open the door.

¶ 18                                    2. *Stacey's Testimony*

¶ 19        Frank's daughter Stacey worked as a home care aide for a company that provided home care services. Stacey had worked for the company for about five years and took Frank on as a client approximately six to eight months before his death. She worked for him for two hours per morning, three days per week, cleaning, cooking, and driving him to doctors' appointments and the grocery store. Although she only did this work for Frank three days per week, she still saw him every day.

¶ 20        Stacey testified that Frank had a stroke in 2006 and a heart attack in 2014, used a cane and walker, and did not drive. He had high blood pressure but was not diabetic and had no

history of seizures. Although Frank sometimes fell down after he had been drinking, it was not a common occurrence, and she could not remember when it had last happened.

¶ 21 Stacey did not know what time she arrived at Frank's house on the day he died, but she was scheduled to work at 10:30 a.m. When she arrived at the house, she could not get in because she had lost her key. She repeatedly knocked on the front door and Frank's bedroom window and shouted to be let in. Between 10:22 and 10:46 a.m., she made 10 phone calls to Frank's cell phone. Although she could hear Frank's phone ringing through his bedroom window, no one answered. She did not call defendant because she did not have his phone number.

¶ 22 Stacey called her job to ask what she should do since she could not enter the house. They told her she was required to do a wellness check, meaning she had to call the police to see if they could get in. After Stacey called 911, Todd Rusk of the Peoria Police Department arrived at Frank's house at approximately 11:30 a.m. For 10 minutes, Rusk knocked on all the doors and windows of the house and yelled to be let inside. Finally, Stacey gave Rusk permission to kick down the front door, but before he did, defendant opened the door, wearing a blanket around his shoulders. Stacey and Rusk went inside and found Frank on the floor of his bedroom, unconscious and barely breathing.

¶ 23 3. *Frank's Injuries*

¶ 24 Frank's face was swollen, and there was a pool of red liquid near his face, possibly blood or vomit. He was rushed to the emergency room, where he was treated by emergency physician Frank Dunaway. Dr. Dunaway testified that Frank was nonresponsive on arrival. Dr. Dunaway put Frank on a ventilator and noted injuries to his left lower jaw, the right side of his scalp, and one of his fingers. A computed tomography scan revealed that Frank had a subdural hematoma, subarachnoid hemorrhage, and intraparenchymal hemorrhage in his brain. Dr.

Dunaway testified that these injuries were consistent with a forceful, shearing-type injury, such as a punch to the head, and they were not consistent with a simple ground-level fall, particularly in light of Frank's jaw fracture and loose teeth. Dr. Dunaway also testified that Frank's injuries were not consistent with a seizure, stroke, or heart attack. Frank was transferred to the intensive care unit but died of his injuries on May 7, 2018.

¶ 25 Amanda Youmans, a forensic pathologist, conducted an autopsy the following day. She confirmed the three levels of hemorrhaging in Frank's brain and documented bruising on his torso and swelling and scabbing on his head, as well as a fractured jaw and fractured ribs on the front and back of his body. According to Dr. Youmans, because Frank had injuries on multiple planes of his body, his injuries would have required multiple impacts. She opined that the cause of death was blunt force trauma to the head, neck, and chest.

¶ 26 4. *Defendant's Involvement*

¶ 27 Defendant gave conflicting stories to the police. Around 7 or 8 a.m., defendant either saw or heard Frank walk past defendant's bedroom. Around 9 or 9:30 a.m., he heard either one or two thudding sounds from Frank's bedroom. Around 10:15 a.m., he walked into Frank's bedroom and saw him on the floor with the pool of red liquid by his face. Defendant told Rusk that Frank had seizures all the time and fell quite often. Defendant said he thought the situation was normal, so he did nothing.

¶ 28 Defendant told the police numerous times that he did not hit his father. Defendant had no injuries to his hands, no murder weapon was identified, and the DNA evidence was inconclusive. Defendant also had no established motive.

¶ 29 5. *Close of Trial*

¶ 30    At the close of the State's case, defendant declined to testify or introduce any evidence. Defendant moved for a directed verdict of not guilty on the grounds that there was insufficient evidence that he was the person who committed the murder. The trial court denied the motion, saying, "The evidence is that the doors and windows were locked, and there were two people in the house. One of them died, apparently from blunt force trauma. It could be inferred that that means the defendant did it."

¶ 31    In her closing argument, defense counsel argued to the jury that the State had not met its burden of proof. Although she primarily emphasized the State's circumstantial evidence that defendant was the person who caused Frank's injuries, she also pointed out that the State was required to prove all the elements of the offense, as well as any separate factual findings, beyond a reasonable doubt.

¶ 32    The jury found defendant guilty of first degree murder and made a separate finding that Frank was 60 years or older at the time of the offense.

¶ 33                           C. Posttrial Proceedings

¶ 34    Defendant moved for a new trial or discharge from custody on the basis that the State failed to prove the elements of the offense beyond a reasonable doubt; the trial court denied the motion. At sentencing, the court noted no mitigating factors and noted the aggravating factors of a history of criminal activity and the need to deter others from committing the same crime. The court noted that defendant's prospects for rehabilitation were poor, particularly in light of his long criminal track record at age 43. The court sentenced defendant to 60 years in the Department of Corrections. Defendant declined to file a motion to reconsider his sentence.

¶ 35    This appeal followed.

¶ 36                           II. ANALYSIS

¶ 37    Defendant argues that (1) the trial court erred by finding he was restored to fitness before trial, (2) the State's circumstantial evidence was insufficient to identify him as the person who committed the murder, (3) his trial counsel was ineffective for allowing the jury to hear two pieces of improper evidence and for purportedly conceding in her closing argument that defendant punched his father, and (4) his sentence is excessive. We address each argument in turn.

¶ 38                    A. Fitness for Trial

¶ 39    Defendant argues that the trial court erred in finding him restored to fitness before trial. Because fundamental rights are involved, we may review this issue for plain error. See *People v. Shaw*, 2015 IL App (4th) 140106, ¶ 23.

¶ 40    Due process forbids the prosecution of a defendant who is unfit to stand trial; unfitness means a defendant is unable to understand the nature and purpose of the proceedings against him or assist in his defense. See *People v. Holt*, 2014 IL 116989, ¶ 51 (citing *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996)); 725 ILCS 5/104-10 (West 2018). A "trial court's ruling on the issue of fitness will be reversed only if it is against the manifest weight of the evidence." *People v. Haynes*, 174 Ill. 2d 204, 226 (1996). Decisions on how the fitness hearing is conducted, however, can be subject to review under the abuse of discretion standard. *People v. Finlaw*, 2023 IL App (4th) 220797, ¶¶ 57-58. For instance, a trial court abuses its discretion by merely "rubber stamp[ing]" an expert's conclusion on the issue of fitness rather than exercising its own discretion and judgment. *People v. Gillon*, 2016 IL App (4th) 140801, ¶ 21; see *People v. Lovelace*, 2018 IL App (4th) 170401, ¶ 33 (noting that a trial court abuses its discretion if it "wholly fails to exercise its discretion"). Defendant's argument falls into the latter category, so we review for an abuse of discretion.

- 8 -

¶ 41      "[B]ecause the issue of fitness is constitutional in dimension, the record must affirmatively show that the court's fitness determination was the product of judicial discretion and judgment." *Gillon*, 2016 IL App (4th) 140801, ¶ 21. The trial court errs by passively accepting the parties' stipulation to the fact of fitness as reflected in an expert's opinion rather than by actively determining whether the defendant is fit. *Id.*; *People v. Lewis*, 103 Ill. 2d 111, 116 (1984). The trial court may, however, accept the parties' stipulation as to what the expert would testify. *Shaw*, 2015 IL App (4th) 140106, ¶ 26. But see *id.* ¶ 55 (Steigmann, J., specially concurring) (describing this as a distinction without a difference). "Where the trial court's determination is based on not only stipulations, but on the court's review of a psychological report and the court's own observations of the defendant, due process is generally satisfied." *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 30.

¶ 42      Defendant asserts that our analysis differs when we review initial fitness determinations, where fitness is presumed, and fitness restoration determinations, where unfitness is presumed. However, this distinction has no bearing on the question of whether the trial court affirmatively exercised its discretion, an obligation that applies to any fitness determination irrespective of what presumptions apply. See *Gillon*, 2016 IL App (4th) 140801, ¶ 21. Moreover, even if there were such a distinction, *Lewis* would still govern the outcome in this case because the supreme court in *Lewis* was considering a fitness restoration determination. See *Lewis*, 103 Ill. 2d at 116.

¶ 43      In support of his argument that the trial court failed to affirmatively exercise its discretion, defendant points to the court's statement, "I'll go along with the recommendation of both lawyers and with the doctor's finding, and I find [defendant] is fit to stand trial." Defendant places too much emphasis on the court's use of the phrase "go along with," which in context clearly

does not mean "blindly accept." At the beginning of the hearing, the State informed the court that "both the People and the Defense, on behalf of her client, will *stipulate to the admissibility* of that report finding that the Defendant is presently fit to stand trial." (Emphasis added.) The State went on to say that the parties were submitting the report "for the Court's consideration on that issue" and that the defense would be asking for a sanity evaluation "if the Court would find the defendant fit at the present time." Defense counsel confirmed that defendant was "stipulating to the January 2nd report" and that "[b]ased on [the court's] finding, if [defendant] is found fit today," she would ask for a sanity examination. She also represented that she no longer had any doubt about defendant's fitness. Considering the transcript as a whole, it is clear that the parties were stipulating to the admissibility of the report and not the ultimate issue of fitness, which they expected the court to determine. This is exactly what the supreme court has found appropriate. *Id.* (finding no error when "[t]he stipulations were not to the fact of fitness, but to the opinion testimony which would have been given by the psychiatrists"). The trial court considered the parties' stipulation along with its review of the psychological report and its observations of defendant, which is sufficient to satisfy due process. *Gipson*, 2015 IL App (1st) 122451, ¶ 30. Although defendant argues that the trial court should have gone further and asked defendant if he had continued to take his medication over the preceding two weeks, the court was under no obligation to do so. See *People v. Goodman*, 347 Ill. App. 3d 278, 287 (2004) ("[W]e are aware of no statute or supreme court rule that requires trial courts to *** independently question a defendant ***.").

¶ 44 Defendant claims that the record is silent as to whether the trial court actually read the report, as required. See *People v. Cook,* 2014 IL App (2d) 130545, ¶ 20 (finding no affirmative exercise of discretion when nothing in the record indicated that the trial court had ever reviewed the expert's report). We disagree. While the court did not explicitly state at the fitness restoration

hearing that it had read the report, the two-page report was previously filed of record and referenced in the court's order setting the fitness hearing, as well as the subsequent order finding defendant restored to fitness. This is a sufficient indication that the court read the report because we presume that a trial court reads documents available to it to make informed decisions. See *Watson v. South Shore Nursing & Rehabilitation Center, LLC*, 2012 IL App (1st) 103730, ¶ 54 ("It is generally presumed that a judge will read material in his possession that is cogent to his decision."). While it would be wise for trial judges to make clear what they have reviewed and how it informed their decisions, we decline to impose a *pro forma* requirement for them to state in open court that they have read what they were obligated to read. But see *Cook,* 2014 IL App (2d) 130545, ¶ 20 (noting that such a statement leaves "no ambiguity about the court's exercise of discretion").

¶ 45    Nevertheless, our presumption can be rebutted with affirmative evidence. Defendant directs our attention to the following exchange on the first day of his trial in October 2022:

"THE COURT: Okay. [Defendant], right now is there anything about your condition physically that I should know about? ***

THE DEFENDANT: No, sir.

THE COURT: How about mentally?

THE DEFENDANT: No, sir.

THE COURT: Are you taking any prescription medications?

THE DEFENDANT: Yes, sir.

THE COURT: Are you taking them as prescribed?

THE DEFENDANT: Yes, sir.

THE COURT: What are they?

THE DEFENDANT: Zoloft."

¶ 46 According to defendant, the trial court must not have read the report in January 2020 because it failed to inquire further about his taking Zoloft instead of olanzapine, sertraline, and lorazepam, the three drugs mentioned in the report. Initially, we take judicial notice that Zoloft is the brand name for sertraline, so defendant was continuing to take one of the medications he had been previously prescribed. *Sertraline (Marketed as Zoloft) Information*, U.S. Food & Drug Administration, https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/sertraline-marketed-zoloft-information (last visited Oct. 25, 2023). We may take judicial notice on appeal of facts that are generally known or readily verifiable from sources of indisputable accuracy, such as the Food and Drug Administration. See *Kramer v. Ruiz*, 2021 IL App (5th) 200026, ¶ 32 n.3; see also *In re Harlin H.*, 2022 IL App (5th) 190108, ¶ 8 & nn.4-16 (listing generic and brand names of various prescription drugs).

¶ 47 Furthermore, while we disagree that a failure to remember three generic drug names from a report after nearly three years would be probative of a failure to read the report, the trial court may well have remembered the names of these drugs but declined to mention them because it could infer from defendant's answers that (1) he was taking Zoloft/sertraline because it was prescribed and (2) he was not taking olanzapine, lorazepam, or any other drugs because they were no longer prescribed. The record simply does not inform us whether defendant was still *prescribed* the same medications he was taking nearly three years before. As such, this exchange does not rebut our presumption that the court read the report before concluding that defendant was restored to fitness in January 2020.

¶ 48        Defendant points to no other facts that should have raised a *bona fide* doubt of his fitness when the trial began in October 2022, other than the fact that he was no longer taking olanzapine and lorazepam; as noted above, the record does not establish that he was still being prescribed those medications in October 2022. The fact that defendant was taking one prescribed medication was not a cause for concern and did not, by itself, necessitate a new fitness hearing. See *People v. Mitchell*, 189 Ill. 2d 312, 329 (2000) ("Due process does not require that everyone taking 'psychotropic or other medication' under medical direction should be granted a fitness hearing."); see also 725 ILCS 5/104-21(a) (West 2022) ("A defendant who is receiving psychotropic drugs shall not be presumed to be unfit to stand trial solely by virtue of the receipt of those drugs or medications.").

¶ 49        In short, the trial court properly exercised its discretion in finding defendant fit to stand trial in January 2020 and did not err in October 2022 by proceeding to try a defendant who stated he was taking his medication as prescribed and showed no signs of unfitness.

¶ 50                              B. Sufficiency of the Evidence

¶ 51        Defendant argues that we should reverse his conviction outright because there was insufficient evidence showing that he was the person who committed the murder. "The due process clause of the fourteenth amendment to the United States Constitution safeguards an accused from conviction in state court except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime charged." *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 314-15 (1979)). In particular, "[t]he State bears the burden of proving beyond a reasonable doubt the identity of the person who committed the charged offense." *People v. Lewis*, 165 Ill. 2d 305, 356 (1995). When considering a challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the State,

any rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. *Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson*, 443 U.S. at 314-15). We allow all reasonable inferences in favor of the State and will not reverse unless the evidence is so unsatisfactory or improbable that it creates a reasonable doubt as to the defendant's guilt. *People v. Givens*, 237 Ill. 2d 311, 334 (2010). Although defendant argues that the State's case was bolstered by improper evidence, we consider all evidence introduced at trial, properly admitted or not, when deciding whether to reverse outright. *People v. Thompson*, 2017 IL App (3d) 160503, ¶ 17.

¶ 52 Defendant concedes that Frank was murdered, but he argues that the State's proof of his responsibility was entirely circumstantial due to the lack of eyewitness testimony, a confession, forensic evidence, or a theory of motive. "It is well settled, however, that the identity of the accused may be established by circumstantial evidence." *People v. Darrah*, 18 Ill. App. 3d 1018, 1022 (1974). Moreover, we apply the same test for sufficiency of the evidence whether the evidence is direct or circumstantial; we no longer require that a conviction based on circumstantial evidence be inconsistent with any reasonable hypothesis of innocence. *People v. Walker*, 2020 IL App (4th) 180774, ¶ 79; see *Jackson*, 443 U.S. at 326 (holding that this is not the constitutional standard). "The sole limitation on the use of circumstantial evidence is that the inferences drawn therefrom must be reasonable." *People v. Grathler*, 368 Ill. App. 3d 802, 808 (2006); see *People v. Davis*, 278 Ill. App. 3d 532, 540 (1996) (contrasting reasonable inferences with "mere speculation").

¶ 53 Here, the heart of the State's case was that defendant must have committed the murder because he was alone with Frank in a locked house when the murder was committed. Defendant is correct that "[o]pportunity alone *** is not sufficient to sustain a conviction unless the State can prove beyond a reasonable doubt that no one else had the opportunity to commit the

crime." *People v. Dowaliby*, 221 Ill. App. 3d 788, 797 (1991). However, it is unclear whether this principle retains its vitality in light of the supreme court's abandonment of the reasonable hypothesis of innocence standard. See *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 98. Assuming without deciding that this principle does apply, we find that a rational jury could conclude beyond a reasonable doubt that defendant and no one else had the opportunity to commit the crime. See *id.* ¶¶ 98-99 (considering *Dowaliby* despite noting the abandonment of the reasonable hypothesis of innocence standard).

¶ 54        According to the testimony received, the house was locked when Stacey arrived at 10:22 a.m.; when Stacey and Rusk finally entered the house shortly before noon, there was no apparent evidence of a break-in, and no one was found inside except defendant and Frank. Based on Frank's cell phone log, the jury could conclude that he was attacked between 8:22 a.m., when he was able to make a call, and 10:22 a.m., when he was not able to answer Stacey's first call. The jury could reasonably infer from these facts that the house was locked during this two-hour time frame and that defendant was the only person who could have attacked Frank. In contrast, an alternative scenario where an unknown assailant entered the house, attacked Frank for no apparent reason, and escaped without being noticed is not a reasonable inference, but rests on mere speculation. *Contra Davis*, 278 Ill. App. 3d at 541 (finding circumstantial evidence of defendant's identity insufficient when the State "produced no evidence of any kind that placed [the defendant] in, at or near the *** home when [the victim] was killed"). The jury "[wa]s not required to *** search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). Instead, the question is if any rational jury could conclude that there was no such unknown assailant, and the answer is yes.

¶ 55        Finally, while the State was not *required* to rule out every reasonable hypothesis of innocence, we nevertheless find that the State did so here by showing that Frank's injuries could not have been accidental or self-inflicted. The evidence, examined in the light most favorable to the State, showed that Frank's injuries could not have been caused by a stroke, seizure, diabetic shock, or simple fall. Moreover, Frank's autopsy showed severe blunt force trauma all over his body, including broken ribs in his back. A rational jury could certainly infer that these severe injuries were not self-inflicted. *Contra Mooney v. People*, 111 Ill. 388, 395 (1884) (*per curiam*) (finding circumstantial evidence unsatisfactory when medical testimony showed that all 33 of victim's knife wounds could have been self-inflicted).

¶ 56        Because a rational jury could conclude that Frank's fatal injuries were not accidental or self-inflicted and that defendant was the only person with the opportunity to inflict them, the evidence introduced at trial was sufficient to sustain defendant's conviction for first degree murder.

¶ 57                            C. Ineffective Assistance of Counsel

¶ 58        Defendant contends that his trial counsel was ineffective for allowing the jury to hear two key pieces of improper evidence and for purportedly conceding in her closing argument that defendant punched Frank. Although this claim was not raised in a posttrial motion, we may consider it on direct appeal because defendant was represented by trial counsel during posttrial proceedings and "trial counsel's failure to assert [her] own ineffective representation in a posttrial motion does not [forfeit] the issue on appeal." *People v. Lawton*, 212 Ill. 2d 285, 296 (2004).

¶ 59        This court analyzes claims of ineffective assistance of counsel under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See, *e.g.*, *People v.*

*Merriweather*, 2022 IL App (4th) 210498, ¶ 40. Under *Strickland*, the defendant has the burden of showing both deficient performance and prejudice.

¶ 60　　　　To satisfy the deficiency prong, "the defendant must prove that counsel made errors so serious, and that counsel's performance was so deficient, that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment." *People v. Evans*, 186 Ill. 2d 83, 93 (1999). Furthermore, "the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *People v. Ramsey*, 239 Ill. 2d 342, 433 (2010). We apply this deferential standard because "[t]here are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. "As a result, counsel's strategic choices that are made after investigation of the law and the facts are virtually unassailable." *Ramsey*, 239 Ill. 2d at 433.

¶ 61　　　　To satisfy the prejudice prong, "[t]he defendant must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Evans*, 186 Ill. 2d at 93. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *People v. Houston*, 229 Ill. 2d 1, 4 (2008).

¶ 62　　　　When a defendant raises a claim of ineffective assistance of counsel for the first time on appeal, our review is *de novo*. *Merriweather*, 2022 IL App (4th) 210498, ¶ 40. Because a defendant must satisfy both prongs to prevail, we need not "address both [prongs] of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697; *Evans*, 186 Ill. 2d at 94. With this in mind, we consider defendant's contentions according to the analysis specified by *Strickland*.

¶ 63                         1. *Evidence of Defendant's Time in Prison*

¶ 64            Ten months before Frank's death, defendant was released on parole after spending eight and a half years in the Department of Corrections for unlawful delivery of a controlled substance. During cross-examination by defense counsel, Stacey interjected defendant's past incarceration as follows:

> "[DEFENSE COUNSEL:] And you said that you thought you probably had been working that job for [Frank] for maybe six to eight months prior to May, correct?
>
> [STACEY RUNYON:] Yeah, I'm not really sure. That was a long time ago.
>
> Q. Okay.
>
> A. I know I worked for them for, like, five years.
>
> Q. In that time frame had your brother, [defendant], lived there that whole time with your dad?
>
> A. Not the whole time. [Defendant] was in jail.
>
> Q. Okay. But he had lived there in the months preceding your dad—
>
> A. Yes.
>
> Q. —correct? Okay. And you said your dad had had a stroke in 2006. To your recollection had he had any other strokes?"

Defense counsel asked several more questions, and the State asked one brief question on redirect examination. After Stacey concluded her testimony, the trial court directed the jury to leave the courtroom and held a sidebar with counsel about Stacey's remark that defendant had been in jail.

¶ 65            We pause to point out a key problem with defendant's assertion that counsel erred by "allowing the jury to hear" this testimony, which was likely inadmissible. See *People v.*

*Thingvold*, 145 Ill. 2d 441, 452 (1991) (noting that evidence of prior criminal activity is generally inadmissible because it "overpersuades the jury, which might convict the defendant only because it feels he is a bad person deserving punishment"). A defendant-appellant claiming that counsel's performance was deficient must identify some action or inaction *by counsel*; dissatisfaction with events beyond counsel's control is not a basis for finding counsel ineffective. See *Ramsey*, 239 Ill. 2d at 433 (stating the deficiency prong applies to "counsel's action or inaction"). When cross-examining a witness, counsel's control over what testimony the jury hears is determined by the questions she asks, and a nonresponsive answer, by definition, goes beyond those questions and thus beyond counsel's control. See *People v. White*, 2011 IL App (1st) 092852, ¶ 74 (explaining that defense counsel does not "elicit" nonresponsive testimony). Absent some showing that counsel's questioning of the witness reflected deficient performance, we cannot fault counsel for "allowing" the jury to hear a nonresponsive answer. In the present case, counsel asked Stacey a yes-or-no question, and Stacey volunteered information about defendant's criminal past. Defendant does not allege that counsel's question was improper, so we adhere to the strong presumption that it was "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

¶ 66        When counsel's questioning is not deficient, we may still examine counsel's reaction to a nonresponsive answer. For instance, this court found an attorney's performance deficient when she failed to move to strike a nonresponsive answer and instead "continued questioning the witness, digging the hole deeper, [and] eliciting damaging testimony not presented as part of the State's case." *People v. Bailey*, 374 Ill. App. 3d 608, 614 (2007). In that case, "[w]e [could not] find a valid trial strategy in [her] pursuit of this line of questioning." *Id.*

¶ 67        Here, a motion to strike the nonresponsive answer and a curative instruction would likely have been legally justified. See *People v. Fritz*, 84 Ill. 2d 72, 80 (1981) ("It is the duty of the court to strike nonresponsive answers to questions, when a proper motion to do so is made."); Illinois Pattern Jury Instructions, Criminal, No. 1.01[8] (approved Apr. 30, 2021) (instructing jury to "disregard testimony *** which the court has refused or stricken."). However, it can also be a valid trial strategy to forgo a motion to strike inadmissible testimony (*People v. White*, 2011 IL App (1st) 092852, ¶ 75) or to decline to seek a curative instruction (see *People v. Peel*, 2018 IL App (4th) 160100, ¶ 52) to avoid drawing attention to unfavorable information.

¶ 68        At the sidebar in this case, the trial court offered to admonish the jury to disregard Stacey's improper testimony. Defendant argues that counsel's decision to decline this offer was objectively unreasonable. We need not conjecture why counsel declined to seek such an admonishment, because she explained her reasoning to the trial court:

> "[DEFENSE COUNSEL]: I think it was nonresponse. I don't think [Stacey] was intending to do anything. And I did, I just moved on because I did not want to draw attention to it. I think that now even if we were to make admonishments to the jury, we would be drawing attention to it. I discussed it with my client. I told him that I could ask for a mistrial. I don't think that's a good idea at this point, and we don't think that it's that detrimental to cause an issue with his representation or with the jury's view of him. And I mean it was very fast and moved on. Here is the deal. They don't know if he was in prison, if he was in jail for the night. It's just an open-ended thing. And I don't think that anywhere in my argument or [the State's] argument it would ever be argued that this was somebody that was in jail and he

was a danger. So at this time, I don't think—I'm not concerned with it. I think I moved on with it and did not draw attention to it, and we are satisfied with that."

¶ 69    The decision to avoid drawing attention to unfavorable information is well established as reasonable trial strategy. *People v. Evans*, 209 Ill. 2d 194, 221 (2004) (finding no deficient performance when "defense counsel allowed the statement [referencing other crimes] to pass without objecting to diffuse its importance, rather than object and draw further attention to the statement"); accord *Milner v. State*, 271 Ga. 578, 578 (1999) ("Trial counsel's decision not to object to a reference that [the defendant] had been in jail was a reasonable trial strategy since he did not want to call the jury's attention to that fact ***."); see *United States v. Myers*, 917 F.2d 1008, 1010 (7th Cir. 1990) (noting that reasonable minds may differ about whether a cautionary instruction would do more harm than good). Accordingly, defense counsel's decision not to seek an admonishment, made after reflection and discussion with her client, the trial court, and opposing counsel, was a reasonable trial strategy and thus not deficient under *Strickland*.

¶ 70                    2. *Evidence of Defendant's Mental Illness*

¶ 71    During Rusk's testimony, the State played a recording of Stacey's 911 call, in which she referred to defendant as "bipolar." Defendant claims that counsel should have prevented the jury from hearing this evidence, which he states was prejudicial. Here again, defendant is not truly arguing *deficiency* because it is unclear what defendant believes counsel should have done differently.

¶ 72    First, as the State points out, defendant does not cite any authority for the proposition that evidence of a defendant's bipolar disorder is prejudicial. Even then, "all evidence is prejudicial in that it is intended to impact the fact finder's decision." *People v. Gordon*, 2017 IL App (3d) 140770, ¶ 25. If counsel's only objection to the admission of this evidence was that it

was prejudicial, then the jury would have heard it over counsel's objection. See *People v. Bradford*, 2019 IL App (4th) 170148, ¶ 14 ("It is axiomatic that a defense counsel will not be deemed ineffective for failing to make a futile objection.").

¶ 73 Even if we assume an objection would have been sustained, defendant still fails to explain why forgoing an objection was a poor strategic decision. See *People v. Pecoraro*, 144 Ill. 2d 1, 13 (1991) (noting the general rule that a failure to object to testimony does not establish incompetent representation). Given that the State relied on defendant's unusual behavior as evidence of a guilty conscience, counsel may well have decided that a fleeting reference to mental illness could undermine the State's case without requiring him to produce evidence. In any event, defendant's conclusory argument has not rebutted our "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," so we find that counsel was not deficient for failing to object to the admission of this statement. *Strickland*, 466 U.S. at 689.

¶ 74 3. *Closing Argument*

¶ 75 During closing argument, defense counsel's primary focus was that the State failed to meet its burden of proof regarding defendant's identity. When concluding her argument, she also addressed the other elements of the offense, again emphasizing the State's burden of proof:

"[DEFENSE COUNSEL]: Now I wouldn't be doing my job if I didn't take it a step further with you. Let's say you believe the State does pass scrutiny, that [defendant] is the one that caused these injuries. The jury instruction that you are going to get is that there is two propositions that they have to prove, the State has to prove. That the defendant performed the acts which caused the death of Frank Runyon. So say you believe that, yes, they did believe that. The second proposition

- 22 -

is that when the defendant did so he knew those acts created a strong probability of death or great bodily harm to Frank Runyon.

Again—and we have testimony that it took great force, although nobody can put a number on that. Okay? Personally, I mean, does that mean that he slammed his head into that dresser? Does he mean he slammed his head on the floor? Does it mean that he punched him? What exactly are they alleging? I don't know. But then you have to go back. If it's—if they are alleging that he hit him somehow, and that's what they want you to believe, then is it—did they prove beyond a reasonable doubt that [defendant] would have known that punching someone would cause that death? I don't know that they would. I think if you shoot someone, you can make a pretty good guess that you are going to cause great bodily harm or possibly death. If you stab someone, could probably make those assumptions as well. But punching someone, people fight all the time. I don't know that that puts you at the level of did that person know that they could cause death or great bodily harm that would cause death."

¶ 76    Defendant claims that this argument constitutes an improper concession that he punched Frank. This claim constitutes an unfair mischaracterization of counsel's closing argument, which was clearly couched in hypothetical terms. Furthermore, counsel correctly informed the jury that they were required to acquit defendant if they found that he had punched Frank but had a reasonable doubt that defendant knew punching Frank "create[d] a strong probability of death or great bodily harm," a necessary element of the offense as charged. See 720 ILCS 5/9-1(a)(2) (West 2018). As noted in our discussion of the sufficiency of the evidence, the State was required to prove each element of the offense beyond a reasonable doubt, and a key aspect of defense counsel's

role under the sixth amendment is to hold the State to that burden. See *United States v. Cronic*, 466 U.S. 648, 656 n.19 (1984) ("[W]hen no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond [a] reasonable doubt."). While this particular avenue for acquittal was not central to counsel's closing argument, her decision to emphasize the State's burden of proof on every element of the offense was not only not deficient under *Strickland*—it was strategically sound.

¶ 77        Because defendant has not satisfied his burden of showing that any of defense counsel's decisions were deficient under *Strickland*, we find that he was not denied the effective assistance of counsel guaranteed by the sixth amendment (U.S. Const., amend. VI).

¶ 78                                D. Excessive Sentence

¶ 79        Defendant argues that his 60-year sentence is excessive because it is more than three times the mandatory minimum and constitutes a *de facto* life sentence, given that he is likely to die before he is eligible for release at age 98. Defendant concedes that his excessive-sentence claim was not raised in a postsentencing motion and thus can only be reviewed for plain error. Before addressing plain error, we consider whether the trial court erred at all. *See Merriweather*, 2022 IL App (4th) 210498, ¶ 37 ("Since we have found no error, we need not address plain error.").

¶ 80        First, "*de facto* life sentence" is a term of art that refers to a sentence of 40 years or more imposed on a defendant who was a juvenile at the time of the offense. *People v. Buffer*, 2019 IL 122327, ¶ 41. In certain circumstances, a *de facto* life sentence is unconstitutional because it denies the juvenile offender " 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " *Id.* (quoting *Miller v. Alabama*, 567 U.S. 460, 479 (2012)). In the present case, defendant is likely to spend the rest of his life in prison, but he was not a juvenile at the time of the offense, so neither *Miller*'s holding nor its rationale apply here.

See *People v. Harris*, 2018 IL 121932, ¶ 61 (declining to extend *Miller* to offenders 18 or older); *People v. Kruger*, 2021 IL App (4th) 190687, ¶ 32 (noting the possibility of *Miller*-based claims by offenders between 18 and 20). Instead, we analyze defendant's excessive-sentence claim under the usual framework for nonjuvenile offenders. See, *e.g.*, *People v. Green*, 2020 IL App (5th) 170462, ¶¶ 37-43 (finding that a 60-year sentence was not excessive for a 22-year-old offender).

¶ 81    A sentence within the statutory limits prescribed by the legislature carries with it a presumption of validity and will only be reversed when the trial court abused its discretion. *People v. Musgrave*, 2019 IL App (4th) 170106, ¶ 56. A trial court abuses its discretion when its sentence is manifestly disproportionate to the seriousness of the offense or greatly at variance with the spirit and purpose of the law. *People v. Fern*, 189 Ill. 2d 48, 54 (1999). When reviewing a sentence for excessiveness, we do not substitute our judgment for the trial court's merely because we might have weighed the sentencing factors differently. *People v. Klein*, 2022 IL App (4th) 200599, ¶ 37.

¶ 82    Defendant argues that the trial court abused its discretion in sentencing him to what is effectively a life sentence because he has a mental disability, no prior violent felony convictions, and no history of violence. It is clear from the record that the court was aware of these factors because it heard defense counsel's arguments at the sentencing hearing regarding defendant's mental illness, lack of violent criminal history, and the fact that he was likely to die in prison. See 730 ILCS 5/5-4-1(a)(5), (b) (West 2022) (stating a trial court must consider parties' arguments when imposing sentence). Defendant invites us to reweigh these factors, which is beyond our role on appeal. *Klein*, 2022 IL App (4th) 200599, ¶ 37. Even then, the seriousness of the offense is the most important factor; the trial court does not abuse its discretion by assigning greater weight to the severity of the offense than to mitigating factors. *People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 112. There is perhaps no offense more serious under Illinois law than first degree murder (see

730 ILCS 5/5-4.5-20 (West 2022)), and the facts of this case are especially serious. *Aquisto*, 2022 IL App (4th) 200081, ¶ 112 (considering "the particular facts and circumstances of the defendant's offense").

¶ 83 Frank was 74 years old and walked with a cane. He had multiple, serious medical problems and required home health care services to meet his basic needs. He was attacked by his own son in his own home, either unable or unwilling to defend himself. Frank was beaten multiple times across his chest, neck, and head, and his injuries included a broken jaw, broken ribs, and severe bleeding in three layers of his brain. He suffered from these injuries for days before he died. A mid-range, 60-year sentence was not manifestly disproportionate to the seriousness of this offense.

¶ 84                                  III. CONCLUSION

¶ 85 For the reasons stated, we affirm the trial court's judgment.

¶ 86 Affirmed.