NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 240887-U

NO. 4-24-0887

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 17, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| NAKEITHIAN CORTEZ JOHNSON, | ) | No. 21CF1145 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Debra D. Schafer, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Presiding Justice Harris and Justice Vancil concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed, concluding (1) the trial court adequately considered defendant's rehabilitative potential in imposing his 65-year sentence for his convictions of first degree murder and (2) the sentence was not excessive and, therefore, did not constitute an abuse of discretion.

¶ 2     Following a jury trial in March 2024, defendant, Nakeithian Cortez Johnson, was convicted of four counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)) in connection with the fatal shooting of Tammy Gonzalez during the commission of a home invasion perpetrated against unrelated people. The trial court sentenced defendant to a total of 65 years' imprisonment, consisting of 50 years plus a 15-year mandatory firearm enhancement (730 ILCS 5/5-4.5-20(a), 5-8-1(a)(1), (d)(i) (West 2020)). Defendant appeals, arguing his sentence is excessive because the court failed to adequately consider his rehabilitative potential when it imposed his sentence. We disagree and affirm.

¶ 3                                    I. BACKGROUND

¶ 4                              A. Defendant's Charges

¶ 5          On June 23, 2021, the State charged defendant by criminal complaint with one count of first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)), one count of home invasion (*id.* § 19-6(a)(2)), and one count of aggravated battery (*id.* § 12-3.05(a)(1)) in connection with the fatal shooting of Gonzalez during the commission of a home invasion in the residence of Ashley McCammond and Adan Ibarra in Rockford on October 8, 2020. A grand jury returned a true bill on a 12-count indictment on July 7, 2021, charging defendant (and codefendants not involved in this appeal) with various theories of first degree murder, including, *inter alia*, (1) that he personally shot a firearm, thereby causing the death of Gonzalez (*id.* § 9-1(a)(1)); (2) that he was armed with a firearm during the commission of the aforementioned offense (730 ILCS 5/5-8-1(d)(i) (West 2020)); (3) that he knew such an act would cause the death of Gonzalez (720 ILCS 5/9-1(a)(1) (West 2020)); and (4) that he knew such an act created a strong probability of death or great bodily harm to Gonzalez (*id.* § 9-1(a)(2)). The State also alleged defendant committed the offense of home invasion (*id.* § 19-6(a)) during the commission of the murder.

¶ 6                                  B. Jury Trial

¶ 7                            1. *Officer Kevin Clouston*

¶ 8          Rockford police officer Kevin Clouston testified he was on duty at approximately 5:54 a.m. on October 8, 2020, when he received a dispatch informing him of a shooting that occurred near the intersection of 15th Avenue and 6th Street. Officer Clouston traveled to that location but initially was not able to find anything related to the reported shooting. He then received a dispatch informing him that the victim of the shooting had arrived at SwedishAmerican Hospital. Officer Clouston went to the hospital, and when he arrived, he noticed a vehicle parked

in front of the entrance to the emergency department with "an apparent bullet hole" in the front windshield on the driver's side. Officer Clouston also noticed a "person inside of the emergency department yelling," whom he identified as "Roger Fiebrantz." He noticed Fiebrantz was crying and shouting, was "[a]nimated, agitated, pacing around," and was "shouting things such as, man, not my mom, and my mom."

¶ 9                                    2. *Officer Dacoda Van Vleet*

¶ 10            Rockford police officer Dacoda Van Vleet testified she was on duty at approximately 5:54 a.m. on October 8, 2020, when she received a dispatch notifying her of a shooting. While en route to the shooting, she received another dispatch that the victim of the shooting had arrived at SwedishAmerican Hospital. Officer Van Vleet drove to the hospital and saw other officers already there. Another dispatch advised an off-duty officer was flagged down in the parking lot of District 2 police station. Officer Van Vleet drove to the District 2 police station, whereupon she noticed another officer conversing with a male, later identified as Adan Ibarra. Officer Van Vleet also spoke with a female, later identified as Ashley McCammond.

¶ 11                                    3. *Ashley McCammond*

¶ 12            Ashley McCammond testified she resided in a first-floor apartment in Rockford with Adan Ibarra. In the early morning hours of October 8, 2020, McCammond was asleep next to Ibarra. McCammond was awakened by three people wearing black ski masks entering her bedroom proclaiming "they were the police." McCammond was hit in the head near her eye "with the end of a gun." The intruders told McCammond and Ibarra "to turn over," so they "ended up laying on [their] stomachs." The intruders were yelling, asking Ibarra where his drugs and guns were, and they began "throwing everything around in the bedroom." The intruders began taking various items out of her home, including a TV, PlayStation, and games. They took the keys to her vehicle

- 3 -

and the speakers out of her Ford Explorer.

¶ 13    McCammond was "moved to the couch," and Ibarra was "moved to the floor, in the living room." McCammond was hog-tied with an orange extension cord, and a sheet was placed over her head. The intruders searched Ibarra's phone to determine the identity of the person from whom he purchased drugs (who went by the name of "Temper") and were repeatedly "stomping" on his back and shoulder. At some point, someone poured hot candle wax on McCammond and struck her on the side of her head with the glass candle holder. McCammond was later moved to the garage by the intruder who was wearing a "fluffier coat and black and ***black and brown gloves." While McCammond was in the garage, she heard a car pull up outside, "[p]eople talking," a female "shouting," tires squealing as if the driver was attempting to leave, somebody say, "Shoot that b***," and then "one gunshot." The three intruders then "ran off."

¶ 14    Because McCammond's cell phone and keys were taken, she had to walk to the police station to report the incident. McCammond reported what had occurred and met with officers a few more times in the following months. In February 2021, McCammond met with detectives to view photo lineups, where she was able to identify defendant. At trial, she identified defendant.

¶ 15    4. *Roger Garcia-Fiebrantz*

¶ 16    Roger Garcia-Fiebrantz, Gonzalez's son, testified he had "blacked out everything" regarding the events of October 8, 2020. Garcia-Fiebrantz testified he had no memory of contacting Gonzalez to ask for a ride or receiving any communication from Ibarra that day. Garcia-Fiebrantz had no memory of, *inter alia*, (1) Gonzalez driving him that day to Ibarra's home; (2) Ibarra approaching him outside and giving him money; (3) one of the individuals involved in the home invasion coming outside with a gun "and saying, don't move or I'll shoot"; (4) Gonzalez backing

up the car and then being shot by that individual; (5) calling 911 and driving Gonzalez to the hospital; or (6) "screaming for help" upon arriving at the hospital. On cross-examination, Garcia-Fiebrantz testified Ibarra owed him $100 but claimed not to remember if it was in relation to drugs he sold Ibarra. He then claimed to have no memory of going to Ibarra's home to collect the money owed. Garcia-Fiebrantz denied going by the name of "Temper" but moments later admitted he did.

¶ 17                                    5. *Thomas Hawkins*

¶ 18          Thomas Hawkins, who was incarcerated on federal charges for armed robbery, testified that on the evening of October 7, 2020, he was with Dorian Love, whom he knew as "D-Love." Hawkins was asked by D-Love to come over that evening "because he had a robbery that he wanted [him] to be involved with." When Hawkins arrived at D-Love's house, D-Love, a man known as "Little B" and a man known as "Bo-Lord," whom Hawkins identified as defendant, were there. Hawkins drove everyone a few blocks to McCammond and Ibarra's apartment. Hawkins, defendant, and Little B got out of the car wearing ski masks and gloves. D-Love remained in the car because he did not want the residents "to know that he was involved." Little B and defendant entered the apartment through a window and opened the door for Hawkins. The group went to the bedroom, where defendant and Little B pointed guns at McCammond and Ibarra. (Hawkins claimed he did not have a gun.) The group began stealing items, including jewelry, gold teeth, phones, TVs, clothing, McCammond's car keys, and a puppy. Bleach was poured around the kitchen to cover up any evidence. Hawkins then made McCammond and Ibarra go to the living room. At least one person in the group asked McCammond and Ibarra where the drugs were "because that's what [they] had came to get." Drugs were found, but they were not "the right amount." They got mad and told Ibarra to "call whoever he was getting his drugs from and to tell him to come right now and bring some more." Hawkins saw Little B hit McCammond and Ibarra.

¶ 19    Hawkins and defendant then took McCammond to the garage to wait for Ibarra's supplier to arrive. They intended to rob him after breaking the driver's side window with a crowbar. While standing in the garage, Hawkins heard a vehicle approaching. Hawkins (armed with his crowbar in his hoodie) and defendant (armed with his gun) approached the vehicle. Hawkins was unable to break the driver's side window because the crowbar was in his sleeve. According to Hawkins, defendant fired one shot, exclaimed " 'Dude got a gun,' " and they "took off running" back to the truck. D-Love began to drive the group away, but because he was "too drunk to drive," Hawkins had to drive.

¶ 20    Hawkins later saw a news report showing McCammond and Ibarra's residence with yellow crime scene tape. Hawkins knew "something bad had happened." The group decided to dispose of the items they had stolen by depositing them in the Rock River and nearby wooded areas. Hawkins kept the watch and McCammond's phone. He ultimately pawned the watch and recycled the phone at Walmart for cash. Eventually, Hawkins met with police to provide his account of events, identifying defendant in a photo lineup in the process, in exchange for not being charged with first degree murder.

¶ 21                    6. *Dr. Mark Peters*

¶ 22    Dr. Mark Peters is a forensic pathologist and performed the autopsy on Gonzalez on October 9, 2020. He determined Gonzalez died from "a gunshot wound to the chest."

¶ 23                    7. *The Verdicts*

¶ 24    The jury returned verdicts of guilty on counts VII, VIII, X, and XI of the indictment, finding defendant guilty of first degree murder during the commission of a home invasion (720 ILCS 5/9-1(a)(1) (West 2020)) and first degree murder with a strong probability of death or great bodily harm *Id.* § 9-1(a)(2). (On the State's motion, counts I through VI had previously been

dismissed.) The jury found defendant was armed with a firearm during the commission of these offenses (counts VIII and XI) but did not find the proposition he personally discharged a firearm, thereby proximately causing the death of Gonzalez, was proven (counts IX and XII). The court denied defendant's motion for a new trial.

¶ 25                                C. The Sentencing Hearing

¶ 26        The trial court determined counts VII, X, and XI would merge into count VIII for sentencing purposes. The court then heard victim impact statements from Gonzalez's daughter and McCammond.

¶ 27        Defendant's girlfriend, Kristine Cudak, testified and described having a "good relationship" with defendant. Cudak called defendant her "superman" and said "[h]e saved [her] from things that people don't know about." Cudak described defendant as a good and loyal person, helpful and caring, and having "a good heart." She testified defendant helped with her disabled son and was a good father. Cudak did not believe defendant "should have to be in jail for the rest of his life for something like this."

¶ 28        The State emphasized defendant's lengthy criminal history, consisting of felony convictions both as a juvenile and an adult, and noted his lack of success in completing multiple terms of probation. The State noted defendant's eligibility for a sentence of between 35 and 75 years, given the addition of a mandatory firearm enhancement pursuant to the jury's finding he was armed with a firearm during the commission of the offenses. The State requested defendant be sentenced to 75 years' imprisonment, asserting there was no reason for the heinous offense. The home invasion was planned, involved guns, involved brutalizing two individuals, and an innocent person was shot and killed.

¶ 29    Defendant's counsel acknowledged the tragic and traumatic nature of Gonzalez's death and McCammond's home invasion. Counsel asserted there were "several mitigating factors" it wished the trial court to consider. The "biggest" of these factors was the determination by the jury that defendant did not personally discharge the firearm. Counsel referred to passages of the presentence investigation report (PSI), noting defendant had been "an active father," had been "very prevalent as a father," and had taken that role "very seriously." Defendant had satisfactorily completed drug court probation and had not committed any infractions while incarcerated. Counsel also referred to defendant's lengthy history of significant mental health issues, including suicidal ideation, attention deficit/hyperactivity disorder, posttraumatic stress disorder, and "conduct disorders." Additionally, defendant "witnessed a lot of trauma himself as a child," including "domestic violence in his home." Counsel referred to defendant's respectful demeanor during his participation in preparation of the PSI and in his interactions with counsel. Counsel requested the minimum sentence of 35 years' imprisonment, reiterating the jury's determination that defendant did not personally discharge the firearm. Counsel noted defendant was 33 years old and, if granted the minimum sentence, would be released at the age of 68, "which would leave him a window of opportunity, again, to re-connect with his children."

¶ 30    Defendant delivered a statement in allocution to the trial court. Defendant apologized to the family of the deceased and his family for letting them down, and he asked the court to forgive him.

¶ 31    In sentencing defendant, the trial court began by noting it "considered the trial evidence, the [PSI], the history, character, and attitude of *** defendant, the evidence and arguments presented today, and [defendant]'s statement of allocution," as well as "all of the statutory matter[s] in aggravation and mitigation." The court agreed defendant "had a difficult

- 8 -

childhood" and pointed out how the PSI addressed psychological issues defendant had from as early as five years of age. The court acknowledged defendant was traumatized by domestic violence during his childhood and noted that while that would explain his later criminal activity, it would not excuse it. Defendant had "several felony convictions as an adult" and was unsuccessful in "almost all" of his interventions, though he was successful in "other [drug] treatment attempts." The court noted defendant's parole had been revoked "a couple of times," including for possession of a stolen motor vehicle.

¶ 32 The trial court acknowledged that "[a]ll of the people in back are wounded as a result of what happened on October 8th. Every one of them is broken as a result of it." The court addressed the gravity of the offenses, noting an "amazing" number of felonies were committed that night, "[a]nd it went on for quite a while." The court stated, "I'm not sentencing you for pulling the trigger, but you were just as involved as the others. And it was a night of horror for the people in the house, for the people who came to the house, and for all of the people who are in this courtroom." The court found defendant's "history of prior delinquency or criminal activity" and the fact he was on mandatory supervised release at the time of these offenses constituted factors in aggravation and stated, "I've considered all of them, whether I mention them specifically or not." The court found the minimum sentence to be inappropriate "for a number of reasons." The court referred specifically to "the long period of time that this happened and everything that occurred during the course of that," defendant's court involvement "for years" prior to the offense, and the fact he was "involved in the court system *** at the time of the offense." Defendant was sentenced to a total of 65 years' imprisonment, consisting of 50 years plus a 15-year mandatory firearm enhancement.

¶ 33                D. Defendant's Motion to Reconsider His Sentence

¶ 34             1. *Defendant's Contentions in Support of the Reconsideration of His Sentence*

¶ 35             Defendant contended his 65-year sentence was "excessive in light of the nature and circumstances of the offense" and his "history and character." Defendant also contended the sentence was "excessive" in that he had "no previous history of adult criminal activity except as noted in the [PSI]." Finally, defendant argued that in imposing this sentence, the trial court "failed to take into consideration [his] rehabilitative potential *** and the statutory factors in mitigation."

¶ 36             2. *The Hearing on Defendant's Motion to Reconsider His Sentence*

¶ 37             Defendant's counsel urged the trial court to consider defendant's rehabilitative potential, particularly considering his completion of the drug court program, "which is one of the strictest programs in our county." The State argued the sentence was not excessive and focused on defendant's criminal history and the facts of the underlying offenses. Additionally, the State asserted, "[T]he Court also did take into consideration any rehabilitative potential and the statutory factors in mitigation which, in fact, were mentioned by the Court and considered, we believe, by the Court fully in rendering this sentence."

¶ 38             The trial court began its decision by stating:

> "In terms of rehabilitative potential, I don't think anyone is a lost cause. If somebody wants to turn it around, I mean, I can't speak to what it's going to take to speak to somebody and get them to change their ways. So I certainly don't write you off. That isn't what the sentence is. I'm sure that's what it feels like. It is—there's no doubt it's a harsh sentence. And I think that, at the time that I gave it, that I explained my reasons for it."

¶ 39    The trial court then noted defendant's "many issues when on probation in juvenile court," subsequent sentences where conditional discharge, probation, or parole "had not been completed successfully," and being sentenced to the Illinois Department of Corrections due to petitions to vacate his probation. The court continued:

> "And as I indicated last time, a significant part of the Court's sentence is exactly what happened here. There are murders, and then there are murders. And this is something where a multitude of felonies were being committed by a group of people who went into two people's home, held them for a period of time, torturing them during that time, and all to get money and drugs. And after that, in an effort—in that pursuit of money and drugs, another person was shot and killed when Ms. Gonzalez came to the house with Mr. Garcia-Fiebrantz.
>
> *** For all of the reasons that I laid out at the time, I do believe the sentence is appropriate; and, respectfully, I am going to deny the motion."

¶ 40    This appeal followed.

¶ 41                    II. ANALYSIS

¶ 42    Defendant argues this court should either reduce his sentence to 35 years' imprisonment, consisting of the minimum of 20 years plus the mandatory 15-year firearm enhancement, or remand to the trial court for a new sentencing hearing. Defendant contends that in sentencing him to 65 years, which he characterizes as a "*de facto* life sentence," as he was 33 years old when it was imposed, the trial court "failed to fulfill the mandatory objective of restoring

him to useful citizenship." Defendant maintains his sentence is excessive and constitutes an abuse of discretion "because it completely removes any chance for rehabilitation or a return to useful citizenship despite indications of his rehabilitative potential." Such indications are his successful completion of an inpatient drug treatment program, participating in a literacy program in the county jail, obtaining an Occupational Safety and Health Administration certification, and completing classes to become a forklift driver.

¶ 43        The State responds that defendant's sentence was not excessive nor an abuse of discretion. The State provides a detailed catalogue of defendant's criminal history, including both juvenile and adult felony offenses. The State asserts the trial court adequately considered all the statutory factors in aggravation and mitigation. The record reflects the court's reasoned bases for placing diminished weight on defendant's purported potential for rehabilitation, including his "significant criminal history," poor behavior while on probation, and involvement "in the criminal justice system at the time the crime was committed."

¶ 44        Defendant replies, "[I]t follows that an offender who has rehabilitative potential must be given the opportunity to be restored to useful citizenship (*i.e.*, released from prison)." While the trial court described its sentence as "harsh," this description "was not an indicator that [defendant] was without rehabilitative potential or that he could not be restored to useful citizenship."

¶ 45        The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "The trial court's sentence must be based upon the particular circumstances of the case, including (1) the defendant's history, character, and rehabilitative potential; (2) the seriousness of the offense; (3) the need to protect society; and

(4) the need for punishment and deterrence." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 102. The rehabilitative potential of a defendant is only one of many factors a trial court must weigh in deciding a sentence. *People v. Flores*, 404 Ill. App. 3d 155, 159 (2010). The trial court is not required to expressly outline its reasons for imposing a certain sentence, nor must it explicitly find that the defendant lacks rehabilitative potential. *Id.* Additionally, "a trial court need not place greater weight on a defendant's rehabilitative potential than on the seriousness of the offense and the need to protect the public." *People v. McCain*, 248 Ill. App. 3d 844, 854 (1993).

¶ 46   A trial court must consider both mitigating and aggravating factors when determining an appropriate sentence. *People v. Palmer*, 162 Ill. 2d 465, 483-84 (1994). However, a sentencing court is not obligated to recite and assign value to each factor it relies on. *McCain*, 248 Ill. App. 3d at 854. We will presume the court considered all relevant factors and mitigating evidence before it absent explicit evidence to the contrary. *People v. Halerewicz*, 2013 IL App (4th) 120388, ¶ 43. The weight to be given to aggravating and mitigating factors is left to the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *Sturgeon*, 2019 IL App (4th) 170035, ¶ 104. A court abuses its discretion "where [its] sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). "[T]he reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *Id.* at 209. A sentence within the range prescribed by the legislature is presumed to be proper. *Sturgeon*, 2019 IL App (4th) 170035, ¶ 104.

¶ 47   At the outset, we reject defendant's contention that his sentence is excessive in that, given his age at its imposition, it is tantamount to a "*de facto* life sentence." "[T]he phrase '*de facto* life sentence' is a term of art relevant to eighth amendment (U.S. Const., amend. VIII)

jurisprudence relating to juvenile offenders." *People v. Baysingar*, 2024 IL App (4th) 240601-U, ¶ 39. More particularly, " '*de facto* life sentence' is a term of art that refers to a sentence of 40 years or more imposed on a defendant who was a juvenile at the time of the offense." *People v. Runyon*, 2023 IL App (4th) 230058-U, ¶ 80. As defendant was not a juvenile at the time of the offenses, the connotation we have given to the term "*de facto* life sentence" does not apply. The appellate court has observed that "so long as a defendant's lengthy prison sentence is not otherwise an abuse of discretion, it will not be found improper merely because it arguably amounts to a *de facto* life sentence" as that term may be understood in the common vernacular. *People v. Towns*, 2020 IL App (1st) 171145, ¶ 46.

¶ 48    Contrary to defendant's contention, this court concludes the record reflects the trial court *did* adequately consider his rehabilitative potential as a factor in the determination of his sentence. The court stated it had considered, *inter alia*, "the [PSI]." See 730 ILCS 5/5-4-1(a)(2) (West 2020) (requiring the trial court, at a sentencing hearing, to "consider any [PSIs]"). The appellate court has noted that where "the sentencing court examines the [PSI], it is presumed that the court took into account the defendant's potential for rehabilitation." *McCain*, 248 Ill. App. 3d at 853. The court stated it considered the PSI, and the record does not reflect any "explicit evidence from the record" to the contrary. *Halerewicz*, 2013 IL App (4th) 120388, ¶ 43. The PSI contained a summary of defendant's rehabilitative potential. The summary noted defendant would benefit from rehabilitative services to reduce the likelihood of reoffending in the future and outlined specific recommended services. The PSI also showed defendant completed some vocational programs and had a supportive family. Overall, defendant's problem areas needed to be addressed to reduce recidivism.

¶ 49    Moreover, at the hearing on defendant's motion to reconsider his sentence, the trial

court, stating that "in terms of rehabilitative potential," it did not "think anyone is a lost cause," and told defendant, "I certainly don't write you off." This shows the court did not conclude defendant was beyond the potential for rehabilitation and is another indication the court *did* consider his rehabilitative potential. The court maintained its view the sentence was appropriate after emphasizing the gravity of the crimes. We reiterate that "a trial court need not place greater weight on a defendant's rehabilitative potential than on the seriousness of the offense and the need to protect the public." *McCain*, 248 Ill. App. 3d at 854. The trial court may not have placed the weight on defendant's rehabilitative potential he believes was warranted, but that does not mean it failed to give it adequate consideration.

¶ 50        Defendant was eligible for a baseline sentence of 20 to 60 years' imprisonment for his conviction of first degree murder and a 15-year mandatory firearm enhancement in light of the jury's determination he was armed with a firearm during the offense. Thus, defendant was eligible for a total of between 35 and 75 years' imprisonment. See *People v. Sharpe*, 216 Ill. 2d 481, 484-85 (2005). The trial court sentenced defendant to a baseline sentence of 50 years. With the addition of the applicable mandatory firearm enhancement, the sentence was within the statutory range and is, therefore, "presumed to be proper." *Sturgeon*, 2019 IL App (4th) 170035, ¶ 104. We therefore must consider whether defendant's sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210. We conclude it is not.

¶ 51        "The seriousness of the crime is the most important factor in determining an appropriate sentence[.]" *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). The seriousness of the events underlying the crimes for which defendant was convicted is extremely grave. The testimony established that defendant, his codefendants, and Hawkins orchestrated the violent

- 15 -

invasion of a home for the purpose of stealing drugs belonging to its occupants. Defendant, Little B, and Hawkins forced entry into the home and held McCammond and Ibarra at gunpoint. McCammond was struck in the head with a gun. The group began ransacking the residence, searching for drugs and stealing various items in the process. McCammond and Ibarra were ordered out of the bedroom into the living room, whereupon McCammond was hog-tied with an extension cord and had a sheet placed over her head. Someone then stomped on Ibarra's back and shoulder, poured hot candle wax on McCammond, and struck her in the head with a glass candle holder. McCammond was then moved into the garage, where defendant and Hawkins waited to ambush Ibarra's drug supplier, Garcia-Fiebrantz, who had been summoned to the house to supply drugs when the group was dissatisfied with the amount of drugs they discovered during the home invasion. Once Garcia-Fiebrantz arrived, defendant and Hawkins exited the garage, approached the vehicle, and one of them shot at the vehicle and ran away. This resulted in the death of an innocent mother and grandmother, Gonzalez, who was totally uninvolved in the home invasion.

¶ 52 It bears repeating that this "night of horror," so appropriately described by the trial court, was planned for the purpose of stealing drugs, despite defendant successfully completing substance abuse treatment—a consideration he touted both before the trial court and this court to illustrate his rehabilitative potential in support of the statutory minimum sentence. "[A] trial court need not place greater weight on a defendant's rehabilitative potential than on the seriousness of the offense and the need to protect the public." *McCain*, 248 Ill. App. 3d at 854. This is especially pertinent here, given defendant's extensive criminal record, which includes multiple felonies, both as a juvenile and an adult, and unsuccessful terminations of his probation. As a juvenile, defendant was adjudicated delinquent for the Class 4 felony of criminal damage to state-supported property and sentenced to three years' juvenile probation. In 2008, after six petitions to vacate, defendant's

probation was terminated unsatisfactorily. In 2009, defendant was convicted of the Class 4 felony of possession of a controlled substance and sentenced to 24 months' drug court probation, which he successfully completed. However, in 2012, defendant was convicted of the Class 3 felony of delivery of a lookalike substance and sentenced to, *inter alia*, 30 months' probation, which was again terminated unsatisfactorily. In 2013, defendant was convicted of the Class 2 felony of possession of a stolen motor vehicle and sentenced to four years' imprisonment. Defendant was released on parole the following year, only to have his parole revoked. In 2017, defendant was convicted of the Class 3 felony of aggravated battery and sentenced to, *inter alia*, 24 months' probation, only to have this probation revoked and be resentenced to 4 1/2 years in prison. While defendant was on parole for aggravated battery, he participated in the home invasion that led to the murder of Gonzalez.

¶ 53        We conclude defendant's 65-year sentence is not "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210. Defendant's sentence is not excessive and does not constitute an abuse of discretion on the part of the trial court.

¶ 54                                  III. CONCLUSION

¶ 55        For the reasons stated, we affirm the judgment of the trial court.

¶ 56        Affirmed.